1  CRAIG S. RITCHEY   (SBN 45829)          E-Filed 10/19/09
   JOHN G. HURSH   (SBN 113149)
2  PATRICIA A. WELCH   (SBN 127889)
   KAREN E. WENTZEL   (SBN 112179)
3  DORSEY & WHITNEY LLP
   1717 Embarcadero Road
4  Palo Alto, CA 94303
   Telephone:  (650) 857-1717
5  Facsimile:  (650) 857-1288
   E-Mail:   efilingpa@dorsey.com
6          ritchey.craig@dorsey.com
           hursh.jack@dorsey.com
7          welch.patricia@dorsey.com
           wentzel.karen@dorsey.com
8
   Attorneys for Plaintiff
9  MAITA DISTRIBUTORS, INC. OF
   SAN MATEO COUNTY

10               UNITED STATES DISTRICT COURT

11              NORTHERN DISTRICT OF CALIFORNIA

12                     SAN JOSE DIVISION

13  MAITA DISTRIBUTORS, INC. OF         CASE NO. 5:09-CV-02318 RMW
    SAN MATEO COUNTY, a California
14  corporation                        REVISED [PROPOSED] ORDER TO SEAL
                                        DOCUMENTS FILED IN SUPPORT OF
15            Plaintiff,                DEFENDANT DBI BEVERAGE INC.'s
                                        MOTION FOR SUMMARY JUDGMENT, OR
16  v.                                  IN THE ALTERNATIVE, SUMMARY
                                        ADJUDICATION
17  DBI BEVERAGE INC., a Tennessee
18  corporation,                        HEARING DATE:  October 30, 2009
                                        TIME:          9:00 a.m.
19            Defendant.                DEPT:          Courtroom 6, 4th Floor

20                                      Complaint Filed (in State Court):
                                        May 6, 2009
21
22  MILLERCOORS, LLC, a Delaware limited  Matter Removed on:
    liability company,                    May 26, 2009
23
              Intervenor.               Judge: Hon. Ronald M. Whyte
24

25     TO ALL PARTIES HEREIN:

26        The Court has read and considered Defendant DBI Beverage, Inc. ("DBI")'s

27  Administrative Motion for a Sealing Order in Support of Its Motion for Summary Judgment, or

28  in the Alternative, Summary Adjudication ("Motion") and Plaintiff Maita Distributors, Inc. of

                                    -1-

1  San Mateo County's Response ("Response") and the accompanying declaration of Marcus Maita,

2  pursuant to Local Rules 79-5 and 7-11, to file selected documents comprised of highly sensitive

3  information regarding Plaintiff Maita Distributors, Inc. ("Maita")'s private negotiations, financial

4  information, and trade secrets under seal.

5       Maita's interest in protecting information concerning private negotiations, financial

6  information, and trade secrets overcomes the right of public access to these records, and are

7  compelling reasons to support the sealing of the records.  If the records are not sealed, there is a

8  substantial probability that Maita's interests in the confidential information, financial

9  information, and trade secrets will be prejudiced or used for improper purposes.  The sealing is

10  narrowly tailored in that it is limited only to those documents containing such information.

11  Compelling reasons appearing therefor, this Court finds pursuant to Civil L.R. 79-5, that:

12      (1)   The documents to be sealed, or portions thereof, are
             entitled to protection under the law, that overcomes the

13             right of public access to the record; and

14      (2)   The proposed sealing is narrowly tailored.

15       IT IS ORDERED THAT the Motion and Response (1) to seal in their entirety Exhibits K,

16  M and N to the Declaration of Mark K. Slater In Support of DBI's Motion for Summary

17  Judgment, or in the Alternative, Summary Adjudication; (2) to seal the highly confidential

18  information contained in and redacted from Exhibits A, C, E, G, I, and J to the Declaration of

19  Mark K. Slater In Support of DBI's Motion for Summary Judgment, or in the Alternative,

20  Summary Adjudication, as shown in Exhibit 1 attached hereto; and Exhibit A to the Declaration

21  of Joseph E. Thompson In Support of DBI's Motion for Summary Judgment, or in the

22  Alternative, Summary Adjudication, as shown in Exhibit 2 attached hereto; and (3) to seal the

23  highly confidential information redacted from DBI's Motion for Summary Judgment, or in the

24  Alternative, Summary Adjudication as filed is GRANTED and that those documents and

25  portions of documents are hereby ordered to be filed under seal.  Unredacted copies of the
     exhibits shall be filed under seal; redacted copies shall be filed

26  in the public record.
    DATED: _____

27     10/19/09

28                             *Ronald M. Whyte*
                            UNITED STATES DISTRICT JUDGE

REVISED [PROPOSED] ORDER TO SEAL DOCUMENTS FILED IN       5:09-CV-02318 RMW
SUPPORT OF DBI'S MOTION FOR SUMMARY JUDGMENT

EXHIBIT 1

1  SHEPPARD, MULLIN, RICHTER & HAMPTON LLP
     A Limited Liability Partnership
2    Including Professional Corporations
   MARK K. SLATER, Cal. Bar No. 129742
3  JONATHAN P. HERSEY, Cal. Bar No. 189240
   ELISE K. SARA, Cal. Bar No. 253813
4  MOLLY R. NEWLAND, Cal. Bar No. 244928
   4 Embarcadero, 17th Floor
5  San Francisco, California 94111-4109
   Telephone:    415-434-9100
6  Facsimile:    415-434-3947
   mslater@sheppardmullin.com
7  jhersey@sheppardmullin.com
   esara@sheppardmullin.com
8  mnewland@sheppardmullin.com

9  Attorneys for Defendant
   DBI BEVERAGE INC.
10

11                    UNITED STATES DISTRICT COURT

12         NORTHERN DISTRICT OF CALIFORNIA, SAN JOSE DIVISION

13

14  MAITA DISTRIBUTORS, INC. OF SAN          Case No.: 5:09-CV-2318 RMW (HRL)
    MATEO COUNTY, a California corporation,
15
                    Plaintiff,
16                                            DECLARATION OF MARK K. SLATER
                                              IN SUPPORT OF DBI BEVERAGE INC.'S
17            v.                              MOTION FOR SUMMARY JUDGMENT,
                                              OR IN THE ALTERNATIVE, SUMMARY
18  DBI BEVERAGE INC., a Tennessee            ADJUDICATION
    corporation,
19
                    Defendant.                Hearing date:   October 30, 2009
20                                            Time:           9:00 a.m.
                                              Dept.:          Courtroom 6, 4th Floor
21
                                              Complaint Filed (in State Court):
22                                            May 6, 2009

23                                            Removed:
                                              May 26, 2009
24

25

26

27

28

                                     -1-
W02-WEST:5ELS1\401689650.4          SLATER DECLARATION IN SUPPORT OF DBI'S
                                    MOTION FOR SUMMARY JUDGMENT, OR IN THE
                                    ALTERNATIVE, SUMMARY ADJUDICATION

## DECLARATION OF MARK K. SLATER

I, Mark K. Slater, declare as follows:

1.     I am an attorney duly admitted to practice before this Court. I am a partner with Sheppard, Mullin, Richter, & Hampton LLP, attorneys of record for Defendant DBI Beverage Inc. ("DBI"). I have personal knowledge of the following facts, and, if called as a witness, I could and would competently testify thereto.

2.     This declaration is submitted in support of DBI's Motion for Summary Judgment, or, in the Alternative, Summary Adjudication.

3.     MillerCoors, LLC, successor beer manufacturer to Miller Brewing Company and Coors Brewing Company, terminated Plaintiff and named DBI it successor beer distributor for various territories, including those previously covered by Plaintiff Maita Distributors, Inc.'s ("Maita") in San Mateo County, pursuant to California Business and Professions Code section 25000.2. DBI initiated arbitration with JAMS against Plaintiff as required section 25000.2 when the parties failed to reach an agreement over the fair market value of Plaintiff's distribution rights. Plaintiff refused to arbitrate.

4.     On February 6, 2009, DBI was forced to bring a Petition to Compel Arbitration ("Petition") in San Mateo Superior Court (the "San Mateo Action") against Plaintiff and two similarly situated distributors, Mussetter Distributing, Inc., and Elyxir Distributing, LLC (collectively "Former Distributors"). DBI was forced to bring the Petition because the Former Distributors refused to arbitrate and JAMS declined to continue with arbitration without a court order or their consent.

5.     On April 22, 2009, I took the deposition of Maita's person most knowledgeable, Mr. Marcus Maita ("Maita Deposition") in the San Mateo Action. The deposition transcript is marked "Confidential" pursuant to the stipulated protective order entered by the San Mateo Court on March 18, 2009. Attached hereto as Exhibit A is a true and correct copy of relevant excerpts from the Maita Deposition transcript.

6.     At the Maita Deposition, I introduced 23 exhibits consisting of documents produced by DBI and by Maita in the course of discovery in the San Mateo Action. These

-2-

SLATER DECLARATION IN SUPPORT OF DBI'S
MOTION FOR SUMMARY JUDGMENT, OR IN THE
ALTERNATIVE, SUMMARY ADJUDICATION

1    documents reflect the history of the negotiations that DBI engaged in with Maita pursuant to

2    section 25000.2. Each of these documents is also marked "Confidential" pursuant to the stipulated

3    protective order entered by the San Mateo Court on March 18, 2009.

4              7.      Attached hereto as Exhibit B is a true and correct copy of Exhibit 2 to the

5    Maita Deposition.

6              8.      Attached hereto as Exhibit C is a true and correct copy of Exhibit 4 to the

7    Maita Deposition.

8              9.      Attached hereto as Exhibit D is a true and correct copy of Exhibit 5 to the

9    Maita Deposition.

10             10.     Attached hereto as Exhibit E is a true and correct copy of Exhibit 8 to the

11   Maita Deposition.

12             11.     Attached hereto as Exhibit F is a true and correct copy of Exhibit 9 to the

13   Maita Deposition.

14             12.     Attached hereto as Exhibit G is a true and correct copy of Exhibit 10 to the

15   Maita Deposition.

16             13.     Attached hereto as Exhibit H is a true and correct copy of Exhibit 14 to the

17   Maita Deposition.

18             14.     Attached hereto as Exhibit I is a true and correct copy of Exhibit 15 to the

19   Maita Deposition.

20             15.     Attached hereto as Exhibit J is a true and correct copy of Exhibit 16 to the

21   Maita Deposition.

22             16.     Attached hereto as Exhibit K is a true and correct copy of Exhibit 19 to the

23   Maita Deposition.

24             17.     Attached hereto as Exhibit L is a true and correct copy of Exhibit 20 to the

25   Maita Deposition.

26             18.     Attached hereto as Exhibit M is a true and correct copy of Exhibit 21 to the

27   Maita Deposition.

28

-3-

SLATER DECLARATION IN SUPPORT OF DBI'S
MOTION FOR SUMMARY JUDGMENT, OR IN THE
ALTERNATIVE, SUMMARY ADJUDICATION

1          19.      Attached hereto as Exhibit N is a true and correct copy of Exhibit 22 to the

2  Maita Deposition.

3          20.      Attached hereto as Exhibit O is a true and correct copy of Exhibit 23 to the

4  Maita Deposition.

5          21.      Attached hereto as Exhibit P is a true and correct copy of the Miller

6  Brewing Company Distributor Agreement, produced in this matter (Bates labeled MCC00000104-

7  170).

8          22.      Attached hereto as Exhibit Q is a true and correct copy of the Amendment

9  to Martlet Importing Co. Inc Distributor Agreement, produced in this matter by MillerCoors

10  (Bates labeled MCC00000171-179).

11         23.      Attached hereto as Exhibit R is a true and correct copy of the Martlet

12  Importing Co. Inc. Distributor Agreement, produced in this matter by MillerCoors (Bates labeled

13  MCC00000180-255).

14         24.      Attached hereto as Exhibit S is a true and correct copy of the Coors

15  Brewing Company Distributor Agreement, produced in this matter (Bates labeled MCC00000256-

16  293).

17         25.      Attached hereto as Exhibit T is a true and correct copy of Plaintiff's

18  Response to Defendant DBI Beverage Inc.'s First Set of Interrogatories, served on August 26,

19  2009.

20         26.      On or around May 8, 2009, JAMS agreed to proceed with the arbitration

21  that DBI had initiated against Maita in October 2008.

22         27.      On August 4, 2009, I took the deposition of third-party Matagrano, Inc.'s

23  person most knowledgeable, Mr. Louis A. Matagrano ("Matagrano Deposition"), in the JAMS

24  arbitration.  The deposition transcript is marked "Attorneys' Eyes Only" pursuant to the stipulated

25  protective order entered by the Arbitrator on July 16, 2009.  Attached hereto as Exhibit U are true

26  and correct copies of relevant excerpts from the Matagrano Deposition transcript.

27         28.      At the Matagrano Deposition, I introduced 16 exhibits consisting of

28  documents produced by Maita to DBI in the course of discovery in the arbitration.  Attached

W02-WEST:5ELS1\401689650.4                        SLATER DECLARATION IN SUPPORT OF DBI'S
MOTION FOR SUMMARY JUDGMENT, OR IN THE
ALTERNATIVE, SUMMARY ADJUDICATION

1   hereto as Exhibit V is a true and correct copy of Exhibit 4 to the Matagrano Deposition, which has

2   been marked "Attorneys' Eyes Only" pursuant to the stipulated protective order entered by the

3   Arbitrator on July 16, 2009.

4          I declare under penalty of perjury under the laws of the United States that the

5   foregoing is true and correct.

6          Executed September 11, 2009 at San Francisco, California.

7

8                                          /s/ Mark K. Slater
                                           Mark K. Slater
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

W02-WEST:5ELS1\401689650.4

SLATER DECLARATION IN SUPPORT OF DBI'S
MOTION FOR SUMMARY JUDGMENT, OR IN THE
ALTERNATIVE, SUMMARY ADJUDICATION

# EXHIBIT "A"

SUPERIOR COURT OF THE STATE OF CALIFORNIA
FOR THE COUNTY OF SAN MATEO
SOUTHERN BRANCH

DBI BEVERAGE, INC., a Tennessee
corporation, MILLERCOORS LLC, a
Delaware limited liability
company,

       Petitioners,

vs                      CASE NO. 481035

MAITA DISTRIBUTORS, INC., a
California corporation, ELYXIR
DISTRIBUTING, LLC, a California
limited liability company,
MUSSETTER DISTRIBUTING, INC., a
California corporation,

       Respondents.

**CERTIFIED
COPY**

---

CONFIDENTIAL

VIDEOTAPED DEPOSITION OF MARCUS MAITA

San Francisco, California

Wednesday, April 22, 2009

Reported by:
LORI STOKES
CSR No. 12732

Job No. 110357

MARCUS MAITA
CONFIDENTIAL

04/22/09

| | | |
|---|---|---|
| 10:51:32 | 1 | Q.   Did you ever talk to Andy Christon about |
| 10:51:34 | 2 | the termination letter? |
| 10:51:40 | 3 | A.   The only thing I could possibly remember |
| 10:51:43 | 4 | is just telling him it was coming at some point. |
| 10:51:52 | 5 | Q.   Can you please look at page 1 of that |
| 10:51:55 | 6 | termination letter.  I'm going to refer to |
| 10:51:58 | 7 | something during the deposition called a Bates |
| 10:52:01 | 8 | label.  You'll see a stamped number in the bottom |
| 10:52:03 | 9 | right.  It's page 1 of the letter, and the Bates |
| 10:52:05 | 10 | label is MAI6, just so we're looking at the same |
| 10:52:08 | 11 | thing. |
| 10:52:10 | 12 | If I could please direct your attention |
| 10:52:12 | 13 | to the bottom, you'll see a sentence written there |
| 10:52:15 | 14 | that reads, from Miller to you -- I'm sorry, to |
| 10:52:20 | 15 | your father, we appreciate your corporation in |
| 10:52:23 | 16 | negotiating in good faith with DBI Beverage to |
| 10:52:28 | 17 | ensure an efficient transfer of the distribution |
| 10:52:31 | 18 | rights. |
| 10:52:31 | 19 | Do you see that? |
| 10:52:32 | 20 | A.   I'm sorry. |
| 10:52:33 | 21 | Q.   Take your time. |
| 10:52:43 | 22 | A.   Okay. |
| 10:52:45 | 23 | Q.   You have that sentence in mind now? |
| 10:52:47 | 24 | A.   Yes. |
| 10:52:51 | 25 | Q.   Did Maita Distributors negotiate in good |

19

| | | |
|---|---|---|
| 10:52:55 | 1 | faith with DBI Beverage in your mind? |
| 10:52:59 | 2 | A.    In my mind, yes. |
| 10:53:01 | 3 | Q.    At all times? |
| 10:53:03 | 4 | A.    I believe so. |
| 10:53:10 | 5 | Q.    At this point in time -- that is when the |
| 10:53:13 | 6 | termination letter was received -- had anyone |
| 10:53:16 | 7 | conveyed formally, informally, indication, |
| 10:53:21 | 8 | suggestion to DBI what they thought the value of |
| 10:53:26 | 9 | Maita Distributors might be? |
| 10:53:31 | 10 | A.    I'm sorry.  After receiving this letter? |
| 10:53:34 | 11 | Q.    Around the time of the letter. |
| 10:53:35 | 12 | A.    Around the time of the letter? |
| 10:53:37 | 13 | Q.    Let me reask it so we have a clean |
| 10:53:40 | 14 | record.  Up to the date of the letter, September 2, |
| 10:53:43 | 15 | 2008, had anyone on behalf of Maita conveyed to |
| 10:53:49 | 16 | anyone on the DBI side of the table what they |
| 10:53:50 | 17 | thought the value of the Maita distributorship was? |
| 10:53:54 | 18 | A.    Not that I can recall. |
| 10:53:56 | 19 | Q.    And you'll see when we go through the |
| 10:53:59 | 20 | exhibits today, there are formal offer letters, |
| 10:54:02 | 21 | there are informal suggestions.  And I mean by any |
| 10:54:06 | 22 | means. |
| 10:54:08 | 23 | A.    Uh-huh.  I can't remember. |
| 10:54:40 | 24 | MR. SLATER:  I'd like to mark as |
| 10:54:42 | 25 | Exhibit 4 a document Bates labeled from MAI18 to |

20

| | | |
|---|---|---|
| 11:02:44 | 1 | A.    Well, in bridging that gap and filling |
| 11:02:49 | 2 | that hole with our company, there's things you can |
| 11:02:52 | 3 | do to structure your company or that DBI could do |
| 11:02:56 | 4 | in terms of being creative with manpower, |
| 11:03:01 | 5 | operational costs, warehousing costs, fuel costs, |
| 11:03:06 | 6 | utility costs. |
| 11:03:08 | 7 | I mean, there's plenty of synergies that |
| 11:03:13 | 8 | can be created that contribute financially to DBI. |
| 11:03:20 | 9 | Q.    Let me direct your attention to the |
| 11:03:23 | 10 | sentence below -- two sentences, I suppose.  It |
| 11:03:28 | 11 | reads, in making an offer for the, cap R, Rights, |
| 11:03:31 | 12 | please separately allocate the proposed purchase |
| 11:03:34 | 13 | price to the MillerCoors rights, the Crown rights |
| 11:03:37 | 14 | and all other rights DBI proposes to purchase. |
| 11:03:41 | 15 | Do you see that? |
| 11:03:43 | 16 | A.    Is that on the same page? |
| 11:03:45 | 17 | Q.    It's two sentences down on the same page. |
| 11:03:48 | 18 | A.    Yes. |
| 11:03:49 | 19 | Q.    Why was that beneficial to Maita? |
| 11:03:56 | 20 | MR. HURSH:  Why did they want that? |
| 11:03:59 | 21 | BY MR. SLATER: |
| 11:04:01 | 22 | Q.    Why was it -- yes.  We can do it in that |
| 11:04:04 | 23 | order. |
| 11:04:06 | 24 | Why did Maita request that? |
| 11:04:09 | 25 | A.    Well, that request was done -- it was |

26

| | |
|---|---|
| 11:04:16 | 1 |
| 11:04:20 | 2 |
| 11:04:26 | 3 |
| 11:04:36 | 4 |
| 11:04:39 | 5 |
| 11:04:41 | 6 |
| 11:04:42 | 7 |
| 11:04:44 | 8 |
| 11:04:48 | 9 |
| 11:04:49 | 10 |
| 11:04:51 | 11 |
| 11:04:51 | 12 |
| 11:04:55 | 13 |
| 11:04:57 | 14 |
| 11:04:58 | 15 |
| 11:05:00 | 16 |
| 11:05:03 | 17 |
| 11:05:07 | 18 |
| 11:05:09 | 19 |
| 11:05:14 | 20 |
| 11:05:17 | 21 |
| 11:05:23 | 22 |
| 11:05:27 | 23 |
| 11:05:34 | 24 |
| 11:05:39 | 25 |

after discussion with Andy Christon.  He viewed it

as the more beneficial way to request numbers for

the proposed purchase price.  So he -- he just

believed that was the best way to do it.

Q.    The best way for Maita, right?

A.    Yes.

Q.    What benefits did he think would accrue

to Maita by having an offer come back structured

this way?

MR. HURSH:  Objection.  That calls for

speculation.

You can answer.  You can answer to what

he told you.  You can't answer what he was

thinking.

THE WITNESS:  Okay.  Well, one of the

issues was that the termination letter, this whole

situation is pertinent to Miller and Coors.  This

has nothing to do with our entire business.

So in one aspect, I wanted to get a value

for MillerCoors.  With everything else pulled out,

including Crown and others, to explore other

potential avenues, other opportunities out there

for our business and either exploring offering

these brands to competing distributors or other

scenarios.

27

MARCUS MAITA
CONFIDENTIAL

04/22/09

| | |
|---|---|
| 11:05:41 | 1 |
| 11:05:41 | 2 |
| 11:05:44 | 3 |
| 11:05:47 | 4 |
| 11:05:51 | 5 |
| 11:05:53 | 6 |
| 11:05:55 | 7 |
| 11:05:56 | 8 |
| 11:05:58 | 9 |
| 11:06:01 | 10 |
| 11:06:06 | 11 |
| 11:06:14 | 12 |
| 11:06:17 | 13 |
| 11:06:21 | 14 |
| 11:06:21 | 15 |
| 11:06:27 | 16 |
| 11:06:30 | 17 |
| 11:06:30 | 18 |
| 11:06:31 | 19 |
| 11:06:32 | 20 |
| 11:06:35 | 21 |
| 11:06:38 | 22 |
| 11:06:41 | 23 |
| 11:06:44 | 24 |
| 11:06:47 | 25 |

BY MR. SLATER:

Q.   So in other words, you could go to another potential buyer knowing you had an offer that was distributor- or line-specific, right?

A.   Yes.

Q.   And that was a benefit to Maita, right?

A.   Yes.

Q.   And you saw nothing inappropriate in requesting or even requiring that an offer that came from DBI be structured that way, right?

A.   That's how we wanted the offer.

Q.   It's written here, furthermore, it is anticipated that DBI's proposed purchase of Maita's core business of MillerCoors rights also will include the purchase of most of the tangible assets currently used in the conduct of Maita's total business.

Do you see that?

A.   Yes.

Q.   Do you know why that was anticipated?

A.   From what we've heard, that they do total asset purchases of businesses.

Q.   Now, the tangible assets were never really a point of contention or dispute between the parties, were they?

| | | |
|---|---|---|
| 11:51:40 | 1 | BY MR. SLATER: |
| 11:51:40 | 2 | Q.   And you have no reason to think that he |
| 11:51:42 | 3 | did, do you? |
| 11:51:43 | 4 | A.   No. |
| 11:51:44 | 5 | Q.   Was this Confidential Offering Memorandum |
| 11:51:47 | 6 | prepared for DBI? |
| 11:51:51 | 7 | A.   Yes. |
| 11:52:01 | 8 | Q.   This Offering Memorandum does not |
| 11:52:05 | 9 | indicate a purchase price that Maita is willing to |
| 11:52:10 | 10 | accept, does it? |
| 11:52:15 | 11 | A.   No. |
| 11:52:19 | 12 | Q.   At this point in time, did Maita have a |
| 11:52:22 | 13 | purchase price in mind that it would accept? |
| 11:52:35 | 14 | A.   Probably not an exact purchase price, but |
| 11:52:38 | 15 | a range. |
| 11:52:39 | 16 | Q.   And what was that range? |
| 11:52:48 | 17 | A.   At the time of this, we would have highly |
| 11:53:03 | 18 | considered any offer in the ███████████████ |
| 11:53:09 | 19 | ███████████████ |
| 11:53:12 | 20 | Q.   And for what? |
| 11:53:14 | 21 | A.   For distribution rights. |
| 11:53:16 | 22 | Q.   So just so we're saying the same thing, |
| 11:53:19 | 23 | for all distribution rights? |
| 11:53:21 | 24 | A.   Yes. |
| 11:53:24 | 25 | Q.   Can you please turn to page 2 of the |

50

MARCUS MAITA
CONFIDENTIAL

04/22/09

| | | |
|---|---|---|
| 12:58:57 | 1 | believe. Exhibit 6 is a two-page document Bates |
| 12:59:00 | 2 | labeled DBI/Maita 45, DBI/Maita 46. |
| 12:59:05 | 3 | (Whereupon, Exhibit 6 was marked for |
| 12:59:05 | 4 | identification.) |
| 12:59:34 | 5 | BY MR. SLATER: |
| 12:59:42 | 6 | Q.   Had a chance to look at it? |
| 12:59:43 | 7 | A.   Uh-huh. |
| 12:59:45 | 8 | Q.   If I could just ask you to look at page 2 |
| 12:59:47 | 9 | of the document entitled, Maita Distributors Sales |
| 12:59:49 | 10 | Stat FY 2007. |
| 12:59:52 | 11 | Do you see that? |
| 12:59:52 | 12 | A.   Yes. |
| 12:59:53 | 13 | Q.   Do you know who prepared this document? |
| 12:59:55 | 14 | And I mean just this page. |
| 12:59:58 | 15 | A.   This was prepared by my controller, |
| 13:00:02 | 16 | Anselmo. |
| 13:00:04 | 17 | Q.   And what is Anselmo's exact title? |
| 13:00:07 | 18 | A.   Controller, actually. |
| 13:00:09 | 19 | Q.   Controller? |
| 13:00:10 | 20 | A.   Yes. |
| 13:00:11 | 21 | Q.   As you look at these numbers, do you have |
| 13:00:13 | 22 | any reason to think they're inaccurate? |
| 13:00:16 | 23 | A.   No. |
| 13:00:35 | 24 | Q.   At this point in time -- that is, the |
| 13:00:39 | 25 | date on this e-mail, Thursday, October 9, 2008 -- |

61

| | |
|---|---|
| 13:07:41 | 1 |
| 13:07:52 | 2 |
| 13:08:05 | 3 |
| 13:08:10 | 4 |
| 13:08:15 | 5 |
| 13:08:19 | 6 |
| 13:08:20 | 7 |
| 13:08:23 | 8 |
| 13:08:29 | 9 |
| 13:08:30 | 10 |
| 13:08:33 | 11 |
| 13:08:35 | 12 |
| 13:08:36 | 13 |
| 13:08:40 | 14 |
| 13:08:41 | 15 |
| 13:08:42 | 16 |
| 13:08:45 | 17 |
| 13:08:46 | 18 |
| 13:08:48 | 19 |
| 13:08:53 | 20 |
| 13:09:00 | 21 |
| 13:09:03 | 22 |
| 13:09:04 | 23 |
| 13:09:09 | 24 |
| 13:09:15 | 25 |

A.   I laughed.  No, I called -- I called Andy and asked him if he had gotten it.  And he did.  And we just viewed it as, you know, not acceptable.

Q.   Why wasn't it acceptable?

A.   The price wasn't consistent with what we were looking for.

Q.   At this point in time, around October 15, 2008, what sort of price were you looking for?

MR. HURSH:  You're talking about the date of the letter, not when he talked to Andy now, correct?

MR. SLATER:  Good point.  Yeah, let's clarify that.  I mean, if it changed.

MR. HURSH:  I don't know.

MR. SLATER:  Let me set up some foundation to make this easier.

Q.   How long after getting the letter did you talk to Andy?

A.   After I got the e-mail, I think pretty much immediately.  I called him or e-mailed him.  I can't remember which one I did.  But I talked to him that day.

Q.   Was that October 22, October 23, in that time frame?  If you know.

A.   Somewhere around then.  It's whenever we

| 13:09:17 | 1 | got the offer.  It was basically -- basically that |
| 13:09:22 | 2 | day we talked. |
| 13:09:23 | 3 | Q.   And that day, what was the number that |
| 13:09:26 | 4 | you had in mind? |
| 13:09:34 | 5 | A.   That day, we were still basing our |
| 13:09:37 | 6 | evaluation tha same way we had all along, based on |
| 13:09:40 | 7 | a range that was already established with Andy. |
| 13:09:45 | 8 | Q.   And what was that range? |
| 13:09:53 | 9 | A.   Well, the range was ████████████████ |
| 13:10:01 | 10 | ███ |
| 13:10:02 | 11 | Q.   Did that ever change over time? |
| 13:10:05 | 12 | A.   No. |
| 13:10:07 | 13 | Q.   So when you got this letter, you thought |
| 13:10:11 | 14 | the dollar amount of the offer was too low, right? |
| 13:10:15 | 15 | A.   Yes. |
| 13:10:16 | 16 | Q.   And did you really laugh when you got it? |
| 13:10:19 | 17 | A.   No. |
| 13:10:21 | 18 | Q.   Is there anything else about it that you |
| 13:10:23 | 19 | found objectionable? |
| 13:10:31 | 20 | A.   The only thing I found objectionable is |
| 13:10:34 | 21 | that it wasn't broken out the way Andy had |
| 13:10:39 | 22 | requested. |
| 13:10:41 | 23 | Q.   Up to this point in time, when you |
| 13:10:43 | 24 | received this letter -- and the e-mail would tell |
| 13:10:47 | 25 | us the exact day you got it, right? |

66

MARCUS MAITA
CONFIDENTIAL

04/22/09

| | | |
|---|---|---|
| 13:10:50 | 1 | A.    Yes. |
| 13:10:50 | 2 | Q.    Had you ever -- or anyone on the Ippolito |
| 13:10:54 | 3 | side -- ever conveyed to DBI what they thought an |
| 13:10:59 | 4 | acceptable number was? |
| 13:11:03 | 5 | A.    Not that I recall. |
| 13:11:05 | 6 | Q.    Can you please look in the middle of the |
| 13:11:08 | 7 | letter, second paragraph. |
| 13:11:09 | 8 | A.    Uh-huh. |
| 13:11:10 | 9 | Q.    There's a sentence here that reads, we |
| 13:11:11 | 10 | have, however, calculated synergies we believe |
| 13:11:15 | 11 | could be realized based upon the information we |
| 13:11:19 | 12 | have received to date including an organization |
| 13:11:21 | 13 | chart with compensation. |
| 13:11:23 | 14 | Do you see that? |
| 13:11:24 | 15 | A.    Uh-huh. |
| 13:11:26 | 16 | Q.    Do you recall any discussions between the |
| 13:11:30 | 17 | Maita side and the DBI side discussing what those |
| 13:11:35 | 18 | synergies were and whether the parties had |
| 13:11:39 | 19 | different perceptions about what those synergies |
| 13:11:42 | 20 | might be? |
| 13:11:50 | 21 | A.    To the extent of what exact synergies can |
| 13:11:54 | 22 | be realized, no.  I don't recall any specific |
| 13:11:57 | 23 | discussions about what they could be. |
| 13:11:59 | 24 | Q.    Do you recall that the parties held -- |
| 13:12:02 | 25 | apparently held different perceptions about what |

SARNOFF COURT REPORTERS AND LEGAL TECHNOLOGIES
877.955.3855

MARCUS MAITA
CONFIDENTIAL

04/22/09

| | | |
|---|---|---|
| 13:21:20 | 1 | possible counter with Andy Christon? |
| 13:21:29 | 2 | A.   Not that I can remember. |
| 13:21:32 | 3 | Q.   To your knowledge, no brand-only counter |
| 13:21:35 | 4 | was ever made from the Maita side to the DBI side; |
| 13:21:40 | 5 | is that right? |
| 13:21:53 | 6 | A.   When you say offer, you just mean one |
| 13:21:55 | 7 | specific amount in terms of counter? |
| 13:21:58 | 8 | Q.   Here is where I'm -- here is what I'd |
| 13:22:01 | 9 | like to know:  This e-mail reflects and is |
| 13:22:04 | 10 | described as a brand-only offer for the Miller |
| 13:22:08 | 11 | Legacy brand and the Molson Legacy brand |
| 13:22:10 | 12 | portfolios. |
| 13:22:12 | 13 | You see that, right? |
| 13:22:14 | 14 | A.   Right. |
| 13:22:14 | 15 | Q.   Did anyone on the Maita side ever come up |
| 13:22:17 | 16 | with a counteroffer to this brand-only offer? |
| 13:22:26 | 17 | A.   At this point, no. |
| 13:22:27 | 18 | Q.   Ever.  In the discussions with the DBI |
| 13:22:32 | 19 | side. |
| 13:22:53 | 20 | A.   By e-mail confirmation or open general |
| 13:22:57 | 21 | discussion or -- |
| 13:22:58 | 22 | Q.   Any means. |
| 13:23:00 | 23 | A.   I can't remember if a specific amount was |
| 13:23:03 | 24 | countered to them. |
| 13:23:05 | 25 | Q.   Was a counter of any form in your mind |

73

MARCUS MAITA
CONFIDENTIAL
04/22/09

| | | |
|---|---|---|
| 13:32:37 | 1 | Q.   Did you see this letter before it was |
| 13:32:39 | 2 | sent? |
| 13:32:42 | 3 | A.   I can't recall. |
| 13:32:43 | 4 | Q.   Did you discuss the subject matter of the |
| 13:32:45 | 5 | letter with Mr. Christon before it was sent? |
| 13:32:55 | 6 | A.   Yes. |
| 13:32:56 | 7 | Q.   What was the substance of that |
| 13:32:58 | 8 | conversation? |
| 13:33:02 | 9 | A.   I can't recall the exact substance |
| 13:33:04 | 10 | matter.  Just continuous frustration on our side |
| 13:33:08 | 11 | that -- at the way this negotiation was going. |
| 13:33:21 | 12 | It wasn't -- well, I guess it was just |
| 13:33:32 | 13 | based on the frustration how the negotiations were |
| 13:33:37 | 14 | going so far. |
| 13:33:38 | 15 | Q.   In your mind, up to that point in time, |
| 13:33:41 | 16 | October 31, 2008, Maita had negotiated in good |
| 13:33:46 | 17 | faith, right? |
| 13:33:47 | 18 | A.   I believe so. |
| 13:33:48 | 19 | Q.   And to this point in time, October 31, |
| 13:33:50 | 20 | 2008, Maita had made no offer or counter of any |
| 13:33:55 | 21 | sort for either the sale of its entire business or |
| 13:33:58 | 22 | any of the brand portfolios; is that right? |
| 13:34:07 | 23 | A.   I don't think we ever got to that point. |
| 13:34:09 | 24 | Q.   My question was, but you never made a |
| 13:34:12 | 25 | counter or an indication of any sort to the DBI |

79

13:35:26  1    BY MR. SLATER:

13:35:27  2         Q.    Was it yours, as well?

13:35:39  3         A.    To the context of the sentence, yes.

13:35:44  4         Q.    In your mind, you thought a perspective

13:35:47  5    acquisition of Maita by DBI would provide synergies

13:35:52  6    for DBI, right?

13:35:53  7         A.    Yes.

13:35:54  8         Q.    And you wanted Maita to share in those

13:35:57  9    synergies via a high purchase price or a purchase

13:36:01 10    price, right?

13:36:02 11         A.    Not all of them, no.

13:36:04 12         Q.    Is it fair to say some of them?

13:36:13 13         A.    My opinion is synergies create value for

13:36:15 14    a purchaser.  So it should be reflected in a

13:36:19 15    purchase price, synergies.

13:36:20 16         Q.    So that the seller reaps some of the

13:36:23 17    benefit of those perspective synergies, right?

13:36:29 18         A.    If those benefits include a higher

13:36:35 19    purchase price based on the value to a purchaser,

13:36:39 20    if that's the benefit on our side, then yeah.

13:37:18 21              MR. SLATER:   Exhibit 16, Madam Reporter.

13:37:22 22              (Whereupon, Exhibit 16 was marked for

13:37:22 23              identification.)

13:37:45 24              MR. SLATER:   Exhibit 16 is a letter dated

13:37:48 25    November 3, 2008 to Andy Christon from Joe Thompson

| | | |
|---|---|---|
| 13:37:53 | 1 | Bates labeled MAI67. |
| 13:37:57 | 2 | Q.   Mr. Maita, have you seen this letter |
| 13:37:59 | 3 | before? |
| 13:38:00 | 4 | A.   Yes. |
| 13:38:04 | 5 | Q.   To your knowledge, was there any counter |
| 13:38:06 | 6 | or any response to this letter from the Maita side |
| 13:38:11 | 7 | to the DBI side? |
| 13:38:14 | 8 | A.   Not that I can recall. |
| 13:38:43 | 9 | Q..   I just need to check my notes on |
| 13:38:45 | 10 | something. |
| 13:38:47 | 11 | MR. SLATER:   Exhibit 17, a document Bates |
| 13:38:51 | 12 | labeled MAI68. |
| 13:38:54 | 13 | (Whereupon, Exhibit 17 was marked for |
| 13:38:54 | 14 | identification.) |
| 13:39:15 | 15 | THE WITNESS:   Okay. |
| 13:39:16 | 16 | BY MR. SLATER: |
| 13:39:16 | 17 | Q.   You wrote this e-mail, right? |
| 13:39:18 | 18 | A.   Yes. |
| 13:39:19 | 19 | Q.   Why did you write it? |
| 13:39:20 | 20 | A.   Because, at the time, the discussions |
| 13:39:23 | 21 | weren't getting anywhere.  I think there were |
| 13:39:26 | 22 | frustrations on both sides.  And I felt we could |
| 13:39:32 | 23 | maybe make some progress if Patty and myself got a |
| 13:39:38 | 24 | little more involved. |
| 13:39:40 | 25 | Q.   Was there a reason you selected Patty? |

82

MARCUS MAITA                    04/22/09
CONFIDENTIAL

| | | |
|---|---|---|
| 13:59:37 | 1 | left it at -- what was it?  I think there was some |
| 13:59:45 | 2 | line item expenses they wanted to get.  So I said, |
| 13:59:48 | 3 | I'll get those to you right away, which I did. |
| 13:59:51 | 4 | Q.    And I believe you just testified that, in |
| 13:59:53 | 5 | the course of that meeting, Mr. Skinner made |
| 13:59:56 | 6 | another offer on behalf of DBI? |
| 13:59:58 | 7 | A.    Uh-huh. |
| 14:00:00 | 8 | Q.    Do you recall approximately what it was |
| 14:00:01 | 9 | or how it was made? |
| 14:00:05 | 10 | A.    It was pretty much right at the beginning |
| 14:00:08 | 11 | of the meeting.  And it was done -- it was broken |
| 14:00:11 | 12 | out as a multiple of EBITDA and just based on -- |
| 14:00:23 | 13 | well, yeah, our EBITDA with their perceived |
| 14:00:28 | 14 | synergies put in it and multiplied by -- I want to |
| 14:00:35 | 15 | say ███████████████████████ |
| 14:00:39 | 16 | Q.    In the course of that meeting, did you |
| 14:00:42 | 17 | convey any number you would accept on behalf of |
| 14:00:45 | 18 | Maita? |
| 14:00:45 | 19 | A.    No. |
| 14:00:46 | 20 | Q.    Did that meeting actually take place -- |
| 14:00:48 | 21 | forgive me if I asked you this. |
| 14:00:52 | 22 | Did it actually take place on Monday, |
| 14:00:56 | 23 | November 24? |
| 14:00:58 | 24 | A.    Yes, it did. |
| 14:01:35 | 25 | MR. SLATER:  Can you mark this as next in |

89

MARCUS MAITA
CONFIDENTIAL

04/22/09

| | | |
|---|---|---|
| 14:14:00 | 1 | 15, right? |
| 14:14:02 | 2 | A.   Uh-huh. |
| 14:14:03 | 3 | Q.   And your response is reflected in the |
| 14:14:05 | 4 | e-mail above, right? |
| 14:14:07 | 5 | A.   Yes. |
| 14:14:08 | 6 | Q.   And was it your intention writing that |
| 14:14:10 | 7 | e-mail to terminate the discussions? |
| 14:14:26 | 8 | A.   At that point, yes. |
| 14:14:28 | 9 | Q.   At that point, Monday, December 15, when |
| 14:14:31 | 10 | you wrote this e-mail, is it fair to say that Maita |
| 14:14:35 | 11 | had provided no numbers to the DBI side that would |
| 14:14:39 | 12 | have been acceptable for the purchase of either its |
| 14:14:46 | 13 | business or the brand portfolio? |
| 14:14:49 | 14 | A.   Had Maita provided -- |
| 14:14:52 | 15 | Q.   The Maita side. |
| 14:14:56 | 16 | A.   The Maita side? |
| 14:14:57 | 17 | Q.   Yeah. |
| 14:14:58 | 18 | A.   Not a specific amount, no. |
| 14:14:59 | 19 | Q.   Had any offers been conveyed -- I'm going |
| 14:15:01 | 20 | to say -- offers obviously came from the DBI and |
| 14:15:05 | 21 | IBG side.  And it was your judgment the numbers |
| 14:15:09 | 22 | weren't high enough, right? |
| 14:15:11 | 23 | A.   Right. |
| 14:15:12 | 24 | Q.   Had the Maita side ever provided anything |
| 14:15:15 | 25 | like a counteroffer back to the DBI side? |

96

| | | |
|---|---|---|
| 14:15:19 | 1 | A.    Nothing in writing.  No true official |
| 14:15:32 | 2 | counteroffer at this point.  Because we knew we |
| 14:15:36 | 3 | were still quite a ways away. |
| 14:15:39 | 4 | And in my meeting with them in |
| 14:15:41 | 5 | Sacramento, I pretty much conveyed that.  That |
| 14:15:44 | 6 | we're still a ways off, you know, with these |
| 14:15:47 | 7 | offers.  Hopefully we can close the gap. |
| 14:15:50 | 8 | And without giving them the specific, you |
| 14:15:52 | 9 | know, amount, I was saying that the gap was still |
| 14:16:02 | 10 | pretty wide.  They understood it was still pretty |
| 14:16:06 | 11 | wide. |
| 14:16:07 | 12 | Q.    Did you convey anything in the Sacramento |
| 14:16:09 | 13 | meeting about what number would be acceptable to |
| 14:16:12 | 14 | the Maita side? |
| 14:16:13 | 15 | A.    Not the specific number. |
| 14:16:15 | 16 | Q.    I'm sorry, I shouldn't speak over your |
| 14:16:17 | 17 | answers. |
| 14:16:18 | 18 | A.    I apologize. |
| 14:16:20 | 19 | Q.    Not at all. |
| 14:16:21 | 20 | What did you convey generally about -- |
| 14:16:22 | 21 | other than what you've testified to -- about what |
| 14:16:25 | 22 | would be acceptable to Maita? |
| 14:16:31 | 23 | A.    Nothing completely specific.  Just that |
| 14:16:33 | 24 | the gap was still pretty wide.  And that was -- |
| 14:16:41 | 25 | that was pretty much it. |

SARNOFF COURT REPORTERS AND LEGAL TECHNOLOGIES
877.955.3855

14:15:19  1        A.    Nothing in writing.  No true official

14:15:32  2    counteroffer at this point.  Because we knew we

14:15:36  3    were still quite a ways away.

14:15:39  4              And in my meeting with them in

14:15:41  5    Sacramento, I pretty much conveyed that.  That

14:15:44  6    we're still a ways off, you know, with these

14:15:47  7    offers.  Hopefully we can close the gap.

14:15:50  8              And without giving them the specific, you

14:15:52  9    know, amount, I was saying that the gap was still

14:16:02 10    pretty wide.  They understood it was still pretty

14:16:06 11    wide.

14:16:07 12        Q.    Did you convey anything in the Sacramento

14:16:09 13    meeting about what number would be acceptable to

14:16:12 14    the Maita side?

14:16:13 15        A.    Not the specific number.

14:16:15 16        Q.    I'm sorry, I shouldn't speak over your

14:16:17 17    answers.

14:16:18 18        A.    I apologize.

14:16:20 19        Q.    Not at all.

14:16:21 20              What did you convey generally about --

14:16:22 21    other than what you've testified to -- about what

14:16:25 22    would be acceptable to Maita?

14:16:31 23        A.    Nothing completely specific.  Just that

14:16:33 24    the gap was still pretty wide.  And that was --

14:16:41 25    that was pretty much it.

                                                              97

14:14:00  1    15, right?

14:14:02  2         A.    Uh-huh.

14:14:03  3         Q.    And your response is reflected in the

14:14:05  4    e-mail above, right?

14:14:07  5         A.    Yes.

14:14:08  6         Q.    And was it your intention writing that

14:14:10  7    e-mail to terminate the discussions?

14:14:26  8         A.    At that point, yes.

14:14:28  9         Q.    At that point, Monday, December 15, when

14:14:31  10   you wrote this e-mail, is it fair to say that Maita

14:14:35  11   had provided no numbers to the DBI side that would

14:14:39  12   have been acceptable for the purchase of either its

14:14:46  13   business or the brand portfolio?

14:14:49  14        A.    Had Maita provided --

14:14:52  15        Q.    The Maita side.

14:14:56  16        A.    The Maita side?

14:14:57  17        Q.    Yeah.

14:14:58  18        A.    Not a specific amount, no.

14:14:59  19        Q.    Had any offers been conveyed -- I'm going

14:15:01  20   to say -- offers obviously came from the DBI and

14:15:05  21   IBG side.  And it was your judgment the numbers

14:15:09  22   weren't high enough, right?

14:15:11  23        A.    Right.

14:15:12  24        Q.    Had the Maita side ever provided anything

14:15:15  25   like a counteroffer back to the DBI side?

96

| | | |
|---|---|---|
| 13:37:53 | 1 | Bates labeled MAI67. |
| 13:37:57 | 2 | Q.   Mr. Maita, have you seen this letter |
| 13:37:59 | 3 | before? |
| 13:38:00 | 4 | A.   Yes. |
| 13:38:04 | 5 | Q.   To your knowledge, was there any counter |
| 13:38:06 | 6 | or any response to this letter from the Maita side |
| 13:38:11 | 7 | to the DBI side? |
| 13:38:14 | 8 | A.   Not that I can recall. |
| 13:38:43 | 9 | Q.   I just need to check my notes on |
| 13:38:45 | 10 | something. |
| 13:38:47 | 11 | MR. SLATER:   Exhibit 17, a document Bates |
| 13:38:51 | 12 | labeled MAI68. |
| 13:38:54 | 13 | (Whereupon, Exhibit 17 was marked for |
| 13:38:54 | 14 | identification.) |
| 13:39:15 | 15 | THE WITNESS:   Okay. |
| 13:39:16 | 16 | BY MR. SLATER: |
| 13:39:16 | 17 | Q.   You wrote this e-mail, right? |
| 13:39:18 | 18 | A.   Yes. |
| 13:39:19 | 19 | Q.   Why did you write it? |
| 13:39:20 | 20 | A.   Because, at the time, the discussions |
| 13:39:23 | 21 | weren't getting anywhere.   I think there were |
| 13:39:26 | 22 | frustrations on both sides.   And I felt we could |
| 13:39:32 | 23 | maybe make some progress if Patty and myself got a |
| 13:39:38 | 24 | little more involved. |
| 13:39:40 | 25 | Q.   Was there a reason you selected Patty? |

82

MARCUS MAITA
CONFIDENTIAL

04/22/09

13:09:17  1    got the offer.   It was basically -- basically that

13:09:22  2    day we talked.

13:09:23  3         Q.    And that day, what was the number that

13:09:26  4    you had in mind?

13:09:34  5         A.    That day, we were still basing our

13:09:37  6    evaluation the same way we had all along, based on

13:09:40  7    a range that was already established with Andy.

13:09:45  8         Q.    And what was that range?

13:09:53  9         A.    Well, the range was still ███████████

13:10:01 10    ██████

13:10:02 11         Q.    Did that ever change over time?

13:10:05 12         A.    No.

13:10:07 13         Q.    So when you got this letter, you thought

13:10:11 14    the dollar amount of the offer was too low, right?

13:10:15 15         A.    Yes.

13:10:16 16         Q.    And did you really laugh when you got it?

13:10:19 17         A.    No.

13:10:21 18         Q.    Is there anything else about it that you

13:10:23 19    found objectionable?

13:10:31 20         A.    The only thing I found objectionable is

13:10:34 21    that it wasn't broken out the way Andy had

13:10:39 22    requested.

13:10:41 23         Q.    Up to this point in time, when you

13:10:43 24    received this letter -- and the e-mail would tell

13:10:47 25    us the exact day you got it, right?

# EXHIBIT "C"

**From:** Andrew S. Christon [mailto:achriston@ippolitochriston.com]
**Sent:** Sunday, September 28, 2008 4:06 PM
**To:** 'IBG' .
**Cc:** marcus@maitadist.com; 'Susan Massey'
**Subject:** Maita Confidential Offering Memorandum and Forwarding Letter

Joe,
Attached is the Maita COM and an accompanying forwarding letter addressed to you.  Please be reminded that you and anyone who receives a copy of the attached is subject to the Maita Non-Disclosure Agreement signed by Jeff Skinner, as if you or such person had signed the NDA.
Andy

**Andrew S. Christon**
Ippolito Christon & Co.
825 Lewis Speedway - Suite 104
St. Augustine, FL  32084

achriston@ippolitochriston.com
Ph: 904-460-0735
Fx: 904-460-0710

CONFIDENTIAL

MAI000018



# *Ippolito Christon & Co.*

2825 Lewis Speedway • Suite 104 • St. Augustine, Florida 32084          904/460-0735

September 28, 2008

CONFIDENTIAL

Mr. Joe Thompson                                    via email to ibg@hargray.com
Agent for DBI Beverage, Inc. ("DBI")
Independent Beverage Group
49 Honey Locust Circle
Hilton Head Isle, SC 29926-2681

Re:  Maita Distributors, Inc.

Dear Joe:

The shareholders of Maita Distributors, Inc., Inc. ("Maita") have engaged Ippolito
Christon & Co. as their exclusive representative to negotiate sale of Maita's MillerCoors
distribution rights, its non-MillerCoors rights (collectively, "the Rights),a nd other assets of
Maita to DBI.  None of Maita's other suppliers have been notified but they will be at
the appropriate time.

Maita's sale of the Rights and our discussions with you are to be held in strictest
confidence.  Unless Maita provides its consent in writing, you may not disclose to any
supplier or to any other third party the fact that discussions are taking place concerning a
possible transaction.  The information contained in the enclosed Confidential Offering
Memorandum ("COM") is confidential and is to be used only pursuant to the provisions of
the Agreement For Use and Non-Disclosure of Confidential Information ("Non-Disclosure
Agreement") which DBI has signed.  The COM and any additional confidential
information that may be sent to you are to enable DBI to evaluate the possible purchase of
the Rights.

DBI's geographic location on both sides of Maita's exclusive territory offers DBI the
opportunity for a strategic combination with Maita that would create significant
economic value for DBI.  We believe this puts DBI in a position to complete a
transaction satisfactory to Maita and to suppliers whose approval is required.  In making
an offer for the Rights, please separately allocate the proposed purchase price to the
MillerCoors rights, the Crown rights, and all other distribution rights DBI proposes to
purchase.  Furthermore, it is anticipated that DBI's proposed purchase of Maita's core
business of MillerCoors rights also will include the purchase of most of the tangible
assets currently used in the conduct of Maita's total business.

---

*PROVIDING BUSINESS VALUATION AND TRANSACTION SERVICES SINCE 1986*

CONFIDENTIAL                                              MAI000019

Mr. Joe Thompson
September 28, 2008
Page 2

If Maita is satisfied with DBI's proposed purchase price for the Rights, the basic terms of
the proposed transaction would be summarized in a Letter of Intent to be executed
between the parties. Once the parties sign a Letter of Intent, all contacts with other
potential buyers of Maita's non-MillerCoors rights will end during the period specified in
the Letter of Intent.

The information contained in the COM has been compiled in good faith by Ippolito
Christon & Co. from the records of Maita and from information furnished by officers of
Maita. Ippolito Christon & Co. does not warrant the accuracy or completeness of any
information contained herein or hereafter furnished and neither the attached COM nor the
information hereafter furnished shall form the basis of any representations or warranties
made by Ippolito Christon & Co. or Maita.

If DBI's Letter of Intent is accepted, it will be afforded the opportunity to conduct
interviews with the management of Maita and to visit Maita at its operating location in
Redwood City, California. Definitive purchase agreement(s) would then be negotiated
between the parties. That document(s) will contain the only representations and
warranties made in connection with the sale of the offered business.

All inquiries and requests for additional information are to be directed to the following:

Andy Christon
Ippolito Christon & Co.
2825 Lewis Speedway – Suite 104
St. Augustine, FL 32084
(904) 460-0735
Fax: (904) 460-0710 (direct/confidential)
Email: achriston@ippolitochriston.com

Per the Non-Disclosure Agreement, you have agreed not to contact any employee, former
employee, customer, supplier, or representative of Maita other than Ippolito Christon &
Co., concerning a possible transaction to purchase the Rights. Your adherence to strict
confidentiality is appreciated and will help to assure that Maita's day-to-day operations
will be unaffected by the confidential discussions concerning the possible sale of the
Rights.

CONFIDENTIAL

MAI000020

Mr. Joe Thompson
September 28, 2008
Page 3


I want to confirm that if we do not reach an agreement and DBI proceeds to an Arbitration under section 25000.2 of the Calif. Bus. & Prof. Code, neither DBI nor Maita may refer to any document provided or statement made during our discussions.

Very truly yours,

Andrew S. Christon
President


cc:  Marcus Maita, Maita Distributors, Inc.
     Susan G. Massey, Ippolito Christon & Co.

CONFIDENTIAL                                    MAI000021

# CONFIDENTIAL

CONFIDENTIAL OFFERING MEMORANDUM

FOR THE PROPOSED SALE

OF

DISTRIBUTION RIGHTS OF

# MAITA DISTRIBUTORS, INC.

*Redwood City, California*

## September 2008

Prepared for DBI Beverage Inc.

CONFIDENTIAL

MAI000022

## CONFIDENTIAL OFFERING MEMORANDUM

The shareholders of Maita Distributors, Inc. a California corporation ("Maita" or "the Company" or "Wholesaler") have engaged Ippolito Christon & Co. to sell certain of the Company's beer and beverage distribution rights. Each sale will be made subject to the terms and conditions of a definitive asset purchase agreement to be entered into between the buyer and shareholders of Maita. The information contained in this memorandum is confidential and is to be used only pursuant to the provisions of a previously executed confidentiality agreement.

The information contained herein has been compiled in good faith by Ippolito Christon & Co. from the records of Maita and from information furnished by officers of Maita. Ippolito Christon & Co. does not warrant the accuracy or completeness of any information contained herein or hereafter furnished and neither the attached memorandum nor the information hereafter furnished shall form the basis of any representations or warranties made by Ippolito Christon & Co. or Maita.

The person making an accepted bona-fide offer will be afforded the opportunity to conduct his own due diligence and to conduct interviews with the management of Maita. A definitive purchase agreement shall then be negotiated with Maita. Those documents will contain the only representations and warranties made in connection with the sale of the offered assets or common stock.

## ADDITIONAL INFORMATION

The prospective purchaser will be afforded the opportunity to visit the Wholesaler at its operating location in Redwood City, California. All inquiries, requests for a due diligence visit to the facilities and requests for additional information are to be directed to the following:

**Andrew S. Christon**

**Ippolito Christon & Co.**
*2825 Lewis Speedway, Suite 104*
**St. Augustine, FL 32084**

achriston@ippolitochriston.com
**Phone: 904-460-0735**
**Fax: 904-460-0710 (direct/confidential)**

Prospective purchasers are requested <u>not</u> to call or contact management, directly or indirectly, at the Wholesaler's location in Redwood City.

CONFIDENTIAL

MAI000023

# TABLE OF CONTENTS

EXECUTIVE SUMMARY ........................................................................................ 2

TERRITORY DESCRIPTION ................................................................................ 3
    GENERAL INFORMATION ..................................................................................... 3
    AREA DEMOGRAPHICS ......................................................................................... 3
    COMPETITION AND MARKET TRENDS .................................................................. 7

MARGINAL VALUE OF GOLDEN CASES ........................................................ 8
    INTANGIBLE ASSETS ........................................................................................... 8

BRANDS AND TERRITORIES OFFERED FOR SALE ...................................... 9
    CROWN IMPORTS ................................................................................................ 9
    MILLERCOORS AND OTHER BEVERAGES ............................................................ 10

CONFIDENTIAL

MAI000024

*Confidential*                                                  *Maita Distributors, Inc.*

**EXECUTIVE SUMMARY**

Maita is a licensed wholesaler of MillerCoors, Crown Imports, LLC, Anchor Brewing Company, Boston Beer Company, and numerous other suppliers of beer and non-alcoholic beverages. Maita operates in San Mateo County, California, where it is the exclusive wholesaler of its brands for the entire county.

Following are some points that should be considered by a prospective buyer in evaluating the possible acquisition of Maita's brand distribution rights:



*Ippolito Christon & Co.*                                                  *Page 2*

*Confidential*          *Maita Distributors, Inc.*

**TERRITORY DESCRIPTION**

**General Information**

The exclusive franchise territory of Maita Distributors, Inc. consists of San Mateo County. San Mateo County is located south of San Francisco, on the San Francisco Bay. In addition to Redwood City, the County contains the following cities and towns: South San Francisco, San Bruno, Burlingame, San Mateo, San Carlos, and Menlo Park.

San Mateo County is considered part of "Silicon Valley." Accordingly, the area suffered an economic downturn around 2000 when many "dotcom" businesses declined. However, the local economy is rebounding strongly now, in contrast to the doldrums of the national economy.

**Area Demographics**

The following table is a summary of the population trends for San Mateo County from 1980 to the year 2020 (projected):

| Maita Distributors, Inc. Population Trends | | | | |
|---|---|---|---|---|
| | **1980** | **1990** | **2000** | **2010 Est.** |
| **San Mateo County** | 587,329 | 649,623 | 707,161 | 736,667 |
| *% Change* | *N/A* | *10.6%* | *8.9%* | *4.2%* |
| *Annual growth – compounded* | *N/A* | *1.0%* | *0.9%* | *0.4%* |

Sources: 1980, 1990 & 2000, U.S. Bureau of the Census; 2010 projections, State of California, Department of Finance, Demographic Research Unit.

The U.S. Census Bureau estimates that the population of San Mateo County was 718,304 in 2008. The population in Maita's franchise territory is projected to be growing at 0.4% annually during the current decade.

The table on the next three pages provides a description of detailed demographic data for San Mateo County. This data indicates that the area's growth, income level, occupation and household values provide a solid market for growth and expansion in the beverage industry.

CONFIDENTIAL

MAI000026

*Confidential*                                                    *Maita Distributors, Inc.*

| Demographic Snapshot | |
|---|---|
| **Description – County Data** | *San Mateo County, CA* |
| **Population** | |
| 2013 Projection | 731,426 |
| 2008 Estimate | 718,304 |
| 2000 Census | 707,161 |
| 1990 Census | 649,623 |
| Growth 2008-2013 | 1.83% |
| Growth 2000-2008 | 1.58% |
| Growth 1990-2000 | 8.86% |
| **2008 Est. Population by Race Classification** | |
| White Alone | 397,430 |
| Black or African American Alone | 21,988 |
| American Indian and Alaska Native Alone | 3,161 |
| Asian Alone | 169,443 |
| Native Hawaiian and Pacific Islander Alone | 8,901 |
| Some Other Race Alone | 77,080 |
| Two or More Races | 40,301 |
| **Total** | 718,304 |
| **2008 Est. Population by Sex** | 718,304 |
| Male | 356,887 |
| Female | 361,417 |
| Male/Female Ratio | 0.99 |
| | x |
| **2008 Est. Population by Age** | 718,304 |
| Age 16 and over | 568,503 |
| Age 18 and over | 550,166 |
| Age 21 and over | 526,504 |
| Age 65 and over | 95,537 |
| **2008 Est. Median Age** | 39.66 |
| **2008 Est. Average Age** | 38.93 |

*Ippolito Christon & Co.*                                                    *Page 4*

CONFIDENTIAL                               MAI000027

*Confidential*                                        *Malta Distributors, Inc.*

| Demographic Snapshot | |
|---|---|
| *Description – County Data* | *San Mateo County, CA* |
| **2008 Est. Pop. Age 25+ by Educational Attainment** | 493,187 |
| Less than 9th grade | 36,908 |
| Some High School, no diploma | 38,066 |
| High School Graduate (or GED) | 86,511 |
| Some College, no degree | 106,182 |
| Associate Degree | 35,681 |
| Bachelor's Degree | 119,333 |
| Master's Degree | 45,313 |
| Professional School Degree | 15,109 |
| Doctorate Degree | 10,084 |
| | |
| **Households** | |
| 2013 Projection | 257,106 |
| 2008 Estimate | 254,708 |
| 2000 Census | 254,103 |
| 1990 Census | 241,914 |
| | |
| Growth 2008-2013 | 0.94% |
| Growth 2000-2008 | 0.24% |
| Growth 1990-2000 | 5.04% |
| | |
| **2008 Est. Households by Income** | 254,708 |
| Income Less than $15,000 | 15,184 |
| Income $15,000 - $34,999 | 29,645 |
| Income $35,000 - $74,999 | 71,502 |
| Income $75,000 - $149,999 | 87,021 |
| Income $150,000 and more | 51,356 |
| | |
| **2008 Est. Average Household Income** | $112,276 |
| **2008 Est. Median Household Income** | $82,373 |
| **2008 Est. Per Capita Income** | $40,224 |
| | |
| **2008 Est. Pop Age 16+ by Employ Status** | 568,503 |
| In Armed Forces | 111 |
| Civilian - Employed | 365,541 |
| Civilian - Unemployed | 12,533 |
| Not in Labor Force | 190,318 |

*Ippolito Christon & Co.*                                        **Page 5**

CONFIDENTIAL

MAI000028

*Confidential*                                         *Malta Distributors, Inc.*

| Demographic Snapshot | |
| --- | --- |
| Description — County Data | San Mateo County, CA |
| | |
| **2008 Est. Civ Emply Pop 16+ Class Worker** | 365,541 |
| For-Profit Private Workers | 270,749 |
| Non-Profit Private Workers | 22,656 |
| Local Government Workers | 25,666 |
| State Government Workers | 7,458 |
| Federal Government Workers | 7,748 |
| Self-Emp Workers | 30,245 |
| Unpaid Family Workers | 1,019 |
| | |
| **2008 Est. Civ. Employ Pop 16+ by Occupation** | 365,541 |
| Management, Business, & Fin Oper | 71,018 |
| Professional and Related Occupations | 84,754 |
| Service | 49,625 |
| Sales and Office | 99,874 |
| Farming, Fishing, and Forestry | 1,223 |
| Construction, Extraction & Maintenance | 27,549 |
| Production, Transport & Material Moving | 31,498 |
| | |
| **2008 Est. Pop 16+ by Occ Classification** | 365,541 |
| Blue Collar | 59,047 |
| White Collar | 255,280 |
| Service and Farm | 51,214 |
| | |
| **2008 Est. Tenure of Occ Housing Units** | 254,708 |
| Owner Occupied | 156,139 |
| Renter Occupied | 98,569 |
| | |
| **2008 Avg Length of Residence** | 11 |
| | |
| **2008 Est. All Owner-Occ Housing Values** | 156,139 |
| Value Less than $199,999 | 5,513 |
| Value $200,000 - $499,999 | 20,734 |
| Value $500,000 - $999,999 | 83,233 |
| Value $1,000,000 or more | 46,659 |
| | |
| **2008 Est. Median Housing Value** | $785,074 |

*Source: Claritas, Inc.*

*Ippolito Christon & Co.*                                    *Page 6*

CONFIDENTIAL

MAI000029

*Confidential*                                                    *Malta Distributors, Inc.*

**Competition and Market Trends**

In San Mateo County, Malta competes with one other beer wholesaling operation. Following is information about Malta's principal competitor:

- Matagrano, Inc. – Carries the products of Anheuser-Busch, Inc., Heineken USA, and certain other imported beer brands San Mateo County. Based in South San Francisco. Matagrano's market share in the territory is estimated to be approximately 50%.

The following table shows a breakdown of the retail accounts in the North County area, by type:

| Analysis of Retail Accounts | |
|---|---|
| **Account Type** | **#** |
| On-premise licensed | 820 |
| Off-premise licensed | 360 |
| Total retail accounts | 1,180 |

CONFIDENTIAL                                    MAI000030

*Confidential*                                                    *Maita Distributors, Inc.*

## MARGINAL VALUE OF GOLDEN CASES

This proposed transaction involves highly profitable, incremental volume, referred to as "bolt-on brands" or "golden cases." Such incremental volume carries minimal overhead. The marginal contribution of these cases to the buyer and seller is very high since the acquired volume requires minimal direct operating expenses.

It is assumed that the buyer of each group of Maita's brands offered for sale will be either a neighboring wholesaler of the same brands, or a same-market competitor. Either type of buyer stands to realize significant consolidation savings by acquiring substantial additional gross profits with the opportunity to distribute the new brands more efficiently from an existing, nearby warehouse operation.

As a result, the purchaser of the Maita brands should realize substantial <u>incremental</u> earnings before interest, taxes, depreciation, and amortization ("EBITDA") in the first full year following the purchase. Pro forma EBITDA for each brand and territory offered for sale is presented in the following section of this report.

### Intangible Assets

The amortization of the distribution rights purchased by a buyer will create valuable tax benefits for a new owner. It is assumed that the buyer will allocate the entire purchase price in excess of tangible assets purchased to "franchise rights" or "franchise value."

Under the Revenue Reconciliation Act of 1993, intangible assets such as franchise rights acquired in an asset acquisition are amortizable over a 15-year period on a straight-line basis, regardless of their ascertainable useful life. The present value of such benefits for the buyer of the Rights would approximate *$205 per $1,000 of purchased intangible value*, assuming an effective tax rate (federal and state) of 40% and a financial discount rate of 10%.

The value of tax benefits of purchased intangibles to a specific buyer will vary from the calculation above, depending upon the buyer's effective tax rate and the buyer's cost of money. It is expressly noted that <u>no representation or warranty</u> is being made that a prospective purchaser in fact will realize present value tax savings in the amount shown above, which was calculated for illustrative purposes only.

CONFIDENTIAL                                        MAI000031

*Confidential*                                          *Maita Distributors, Inc.*

**BRANDS AND TERRITORIES OFFERED FOR SALE**



*Ippolito Christon & Co.*                                          *Page 9*

noneStop.

*Confidential*                                                      *Maita Distributors, Inc.*



CONFIDENTIAL                              MAI000034

# EXHIBIT "E"



Mr. Andy Christon
Ippolito Christon & Co.
2825 Lewis Speedway
Suite 104
St. Augustine, FL 32084

October 15, 2008

Dear Andy,

We would like to make the following non-binding, offer to purchase certain assets held by Maita Distributors, Inc. ("Maita") on behalf of our client, DBI Beverage Inc. ("DBI"). If this offer meets with your approval, we are prepared to move as quickly as possible to complete the transaction.

It is the intent of DBI to operate the business as a stand-alone entity, much the same as other DBI distributorships. While we acknowledge that there may be some synergies in the acquisition, we cannot accept all items you previously listed as adjustments to EBITDA. We have however calculated synergies we believe could be realized based upon the information we have received to date including an organization chart with compensation. We incorporated these into the offer example below.

Therefore, our offer below assumes an enterprise value as a multiple of Cash Flow in accordance with GAAP.

**Structure:** Asset purchase.

**Payment terms:** 50% cash at closing, 50% owner financing, terms to be negotiated.

**Intangible Assets:** We offer to pay Maita ████████████████████ for its distribution rights for all beverage brands currently distributed by Maita in its current market. This amount is calculated as follows:



CONFIDENTIAL
DBI/MAITA 0094

Mr. Andy Christon
Page 2
October 15, 2008



**Inventory:** DBI would purchase all saleable inventory at closing. Saleable inventory is defined as package product with thirty (30) days or more remaining shelf life and draft with eighteen (18) days or more remaining shelf life. DBI would have thirty (30) days to retrieve all outdated product from the trade and be reimbursed by Maita after Maita's inspection of the returned inventory.

**Equipment:** DBI will purchase all equipment used by Maita in its beverage operations at book value.

**Supplier Approval:** This offer is contingent upon acquiring necessary supplier written approvals.

CONFIDENTIAL
DBI/MAITA 0095

Mr. Andy Christon
Page 3
October 15, 2008

**Due Diligence:** Closing pursuant to a definitive Purchase Agreement would be subject to the satisfactory completion of DBI's investigation of Maita's business, including, but not limited to, the confirmation of volume and gross profit amounts.

**Confidentiality:** All parties agree to maintain strict confidentiality regarding this offer. This is most important to ensure that there is no disruption to your current operation. As discussions proceed, the parties will work toward a formalized Non-Disclosure Agreement.

**Closing:** All parties will work toward a formalized Purchase Agreement with a closing date scheduled not more than thirty (30) days from the completion of due diligence subject to supplier and regulatory approvals. This offer does not create obligations binding on any party, except regarding confidentiality.

Please send all questions and correspondence directly to me. My contact information is as follows:

Joe Thompson
125 Old Plantation Way
Fayetteville, GA 30214
(843) 681-6333 (Office)
(843) 384-0828 (Mobile)
(843) 681-6332 (Fax)

We are very eager to move forward with this transaction. Thank you for your consideration.

Sincerely,


Joe Thompson
President


Accepted by:


_____        _____
                                  Date


CONFIDENTIAL
DBI/MAITA 0096

# EXHIBIT "G"

## TODD ARNOLD

**From:** "TODD ARNOLD" <toddarnold88@msn.com>
**To:** <andy.christon@ippolitochriston.com>; <marcus@maitadist.com>
**Sent:** Tuesday, October 21, 2008 8:31 AM
**Attach:** Offer Letter.doc
**Subject:** Maita

I understand you may not have received the offer sent last week. Attached is the offer. Please respond to let me know you have received.

Todd Arnold 4370 Crestone Clr. Broomfield, CO 80023 toddarnold88@msn.com Office: 303 410-7748 Fax: 303 466-1891



**CONFIDENTIAL
DBI/MAITA 0122**

11/4/2008

**From:** Marcus Maita [mailto:marcus@maitadist.com]
**Sent:** Monday, December 15, 2008 1:26 PM
**To:** 'Jeff Skinner'; 'Patty Fuqua DBI'; 'Andrew S. Christon'; 'John Carievaris'
**Cc:** 'TODD ARNOLD'; 'IBG'
**Subject:** RE: Maita Expense Analysis

Jeff,

With all due respect, I need to get back to focusing on my company and that is how I would like to proceed. I see no benefit in continuing these discussions as it is evident that dbi does not have a serious interest in Maita Distributors. As stated in the Agreement for use and Non-Disclosure of Confidential Information that you executed on September 25, 2008, please return all Proprietary Information and Materials to me or Andy Christon. Also, please confirm in writing that your advisor Joe Thompson has complied with this request as well.

Thank you,

Marcus Maita

**From:** Jeff Skinner [mailto:Jeff.Skinner@ingramentertainment.com]
**Sent:** Monday, December 15, 2008 7:03 AM
**To:** Marcus Maita; Patty Fuqua DBI; Andrew S. Christon; John Carievaris
**Cc:** TODD ARNOLD; IBG
**Subject:** RE: Maita Expense Analysis

3/11/2009                          CONFIDENTIAL                          MAI000092

# EXHIBIT "I"

# Ippolito Christon & Co.

2825 Lewis Speedway, ■ Suite 104 ▪ St. Augustine, Florida 32084      904/460-0735

October 31, 2008                                  Via email:  ibg@hargray.com

Mr. Joe Thompson
Mr. Todd Arnold
Independent Beverage Group
49 Honey Locust Cir
Hilton Head Isle, SC 29926-2681

Dear Joe and Todd:

We are very disappointed that DBI has not negotiated in good faith with Maita
Distributors regarding San Mateo County distribution rights.  Even though we provided
you with a complete offering memorandum containing the sales history and gross profit
information by brand, DBI did not provide any offer to purchase any product of Maita
Distributors, Inc. until after we had received DBI's Demand for Arbitration.  Even then,
DBI's belated "offer" for the MillerCoors brands was so far below fair market value that
it certainly could not be considered to have been offered in good faith.

Your e-mail of yesterday is yet another example of how DBI has not negotiated with
Maita in good faith.   You indicated that DBI remains interested in in buying the
distribution rights for all of Maita's beer brands, "but only as a multiple of EBITDA."

███████████████████████████████████  If and when you submit an indication of your interest for
all of the brands in a dollar amount that is fair and reasonable, we will provide you all of
the detailed information that you may require to complete the customary due diligence
related to the specific brands and tangible assets that DBI proposes to acquire.

███████████████████████████████████
███████████████████████████████████ As you and I both know, there are
numerous transactions in process right now and closed within the last year, in similar
situations, priced at substantially more than your offer.

Furthermore, your contention that you intend to operate Maita's territory as a stand-alone
entity is economically irrational and just plainly disingenuous.  A simple review of a map
of the Bay area from San Francisco to San Jose and DBI's beer distribution business in
the area shows that there will a consolidated and unified DBI operation in the Bay Area.
Perhaps it would be helpful if you consulted with DBI's operations personnel in the

_PROVIDING BUSINESS VALUATION AND TRANSACTION SERVICES SINCE 1986_

CONFIDENTIAL                                          MAI000064

Mr. Joe Thompson
Mr. Todd Arnold
October 31, 2008
Page 2

region, or the field personnel of MillerCoors, who have previously expressed their interest in creating an efficient, consolidated distribution operation in the Bay Area.

DBI is attempting to coerce Maita into selling at a low-ball price well below fair market value. It is our understanding that DBI has engaged in similar conduct in other negotiations in California, apparently for similar reasons. If DBI wishes to make a reasonable fair market value offer for Maita's brands expressed in dollars, please do so now. Unless DBI is willing to come forward with a fair offer which reflects the fair market value of Maita's business, Maita intends to focus its energy on selling beer in San Mateo County and pursuing other options.

Very truly yours,

Andrew S. Christon
President

cc:   Marcus Maita, President, Maita Distributors, Inc.
      Susan G. Massey, CPA, CVA, Ippolito Christon & Co,

CONFIDENTIAL                                          MAI000065

# EXHIBIT "J"

Mr. Andy Christon
Ippolito Christon & Co.
2825 Lewis Speedway
Suite 104
St. Augustine, FL 32084

November 3, 2008

Dear Andy,

Thank you for your letter of October 31, 2008 responding to our offer for certain assets held
by Maita Distributors.

In order to be as clear as possible we make the following cash offer for the brand distribution
rights based upon your projections for 2008 Cash Operating Profit:

We now look forward to receiving a counter offer from your client, expressed in a dollar
amount, for both the MillerCoors portfolio and the total portfolio including MillerCoors.

Please reply to this email to acknowledge receipt of this reply.

Sincerely,


Joe Thompson
President

c: Marcus Maita, President, Maita Distributors, Inc.
   Susan G. Massey, Ippolito Christon & Co.



CONFIDENTIAL

MAI000067

EXHIBIT 2

1  SHEPPARD, MULLIN, RICHTER & HAMPTON LLP
      A Limited Liability Partnership
2      Including Professional Corporations
   MARK K. SLATER, Cal. Bar No. 129742
3  JONATHAN P. HERSEY, Cal. Bar No. 189240
   ELISE K. SARA, Cal. Bar No. 253813
4  MOLLY R. NEWLAND, Cal. Bar No. 244928
   4 Embarcadero, 17th Floor
5  San Francisco, California  94111-4109
   Telephone:    415-434-9100
6  Facsimile:    415-434-3947
   mslater@sheppardmullin.com
7  jhersey@sheppardmullin.com
   esara@sheppardmullin.com
8  mnewland@sheppardmullin.com

9  Attorneys for Defendant
   DBI BEVERAGE INC.

10

11                 UNITED STATES DISTRICT COURT

12        NORTHERN DISTRICT OF CALIFORNIA, SAN JOSE DIVISION

13

14  MAITA DISTRIBUTORS, INC. OF SAN      Case No.: 5:09-CV-2318 RMW (HRL)
    MATEO COUNTY, a California corporation,
15
                  Plaintiff,             **DECLARATION OF JOSEPH E.**
16                                        **THOMPSON IN SUPPORT OF DBI**
           v.                            **BEVERAGE INC.'S MOTION FOR**
17                                        **SUMMARY JUDGMENT**
    DBI BEVERAGE INC., a Tennessee
18  corporation,
                                         Hearing date:   October 30, 2009
19                Defendant.             Time:           9:00 a.m.
                                         Dept.:          Courtroom 6, 4th Floor
20
                                         Complaint Filed (in State Court):
21                                       May 6, 2009

22                                       Removed:
                                         May 26, 2009
23

24

25

26

27

28

                                -1-

## DECLARATION OF JOE E. THOMPSON

I, Joe E. Thompson, declare that:

1.      I am the owner of Independent Beverage Group ("IBG"), and have been President of IBG since 1988.  Prior to founding IBG, I was the National Sales Director for Coors Brewing Company.  Before working for Coors Brewing Company, I worked in National Accounts for Coca Cola USA, and prior to that I was the President of Tipton Distributing Company in Knoxville, Tennessee.  I have personal knowledge of the following facts, and if called as a witness, could and would testify competently to them.

2.      IBG has represented more than 200 beer distributors located throughout the United States with the valuation, sale, or purchase of their businesses.  These distributors have ranged in size from just 200,000 cases per year to more than 14 million cases, and the valuations and negotiations performed by IBG have involved all brands distributed in the United States, including, among others, Anheuser-Busch InBev, Miller-Coors Brewing Company, Heineken USA and Pabst Brewing.  To my knowledge, IBG has successfully completed the merger and acquisition of more beer distributors in the United States than any other firm.

3.      Although not an attorney, I am reasonably familiar with the requirements of California Business & Professions Code Section 25000.2, which took effect in early 2008, requiring a new distributor appointed by a successor beer manufacturer to negotiate the fair market value of the affected distribution rights with the existing wholesaler.

4.      I am informed and believe that in September 2008, MillerCoors—the successor beer manufacturer to Miller Brewing Company and Coors Brewing Company— designated DBI Beverage Inc. ("DBI") as its new distributor in various regions throughout California, including San Mateo County, the Monterey Bay area, the San Joaquin Valley, Placer County, Lake County and Mendocino County.  IBG represented DBI with its negotiations of the fair market value of the affected beer distribution rights with the existing wholesalers in each of these regions.

5.      On DBI's behalf, IBG successfully negotiated the fair market value of the affected distribution rights with the existing distributors in each of these areas except for San

-2-

THOMPSON DECLARATION IN SUPPORT OF DBI'S
                                                    MOTION FOR SUMMARY JUDGMENT

1  Mateo County, Placer County, and the Monterey Bay area.  The existing distributor in San Mateo

2  County for MillerCoors is Maita Distributors, Inc. ("Maita").  As explained below, DBI, with

3  IBG's assistance, negotiated in good faith to reach mutual agreement on the fair market value of

4  Maita's affected distribution rights, but those negotiations were ultimately unsuccessful and

5  prompted DBI's initiation of the statutorily-mandated arbitration process designed and intended to

6  efficiently resolve such issues.

7          6.      Prior to MillerCoors sending Maita formal notice of intent to terminate

8  Maita's distribution rights, I contacted and met with one of Maita's principals, Marcus Maita, and

9  offered to discuss Maita's possible sale of business.  Subsequently, Maita retained Craig Ritchey,

10  an attorney with the Dorsey & Whitney law firm in Palo Alto, and Ippolito Christon & Co.

11  ("ICC") to represent it in connection with a possible sale, and in early September we were

12  contacted to discuss DBI's interest in purchasing Maita's business.

13          7.      I am informed and believe that MillerCoors sent its formal notice of intent

14  to terminate Maita's distribution rights on or about September 2, 2008.

15          8.      Later in September, the parties executed a confidentiality agreement, and on

16  or about September 28, 2008, ICC, on behalf of Maita, sent a Confidential Offering Memorandum

17  for the Proposed Sale of Distribution Rights to IBG on behalf of DBI.  A true and correct copy of

18  the Confidential Offering Memorandum is attached as Exhibit C to the Declaration of Mark K.

19  Slater in Support of DBI's Motion for Summary Judgment.

20          9.      IBG and DBI analyzed the memorandum and requested additional

21  information, including Maita's relevant historical and current year financial information.  IBG and

22  DBI also requested information about Maita's warehouse facility.  ICC provided the requested

23  information on or about October 6, 2008.  A true and correct copy of the e-mail conveying this

24  information exchange is attached as hereto as Exhibit A.

25          10.     After receiving the October 6, 2008 information from Maita, DBI requested

26  additional clarification regarding the information sent.  Maita responded with this information on

27  or around October 9, 2008.

28

W02-WEST:5ELS1\402205380.1          THOMPSON DECLARATION IN SUPPORT OF DBI'S
                                                 MOTION FOR SUMMARY JUDGMENT

1         11.    On or about October 15, 2008, IBG delivered a formal offer to ICC.

2  Neither I nor, to my knowledge, DBI heard back from Maita regarding the offer.  Therefore, on or

3  about October 17, 2008, DBI initiated the arbitration process.

4         12.    On or about October 21, 2008, ICC contacted us to say that they had not

5  received the offer we had emailed on October 15, 2008.  We immediately emailed them another

6  copy of the offer.

7         13.    On or about October 22, 2008, ICC confirmed that they received the offer

8  that we had re-sent the previous day.  Despite DBI's commencement of the arbitration, ICC also

9  asked that IBG and DBI re-submit the offer broken down by dollar amount per brand group.  The

10  following day, IBG informed ICC that DBI was interested in purchasing Maita's entire portfolio

11  of distribution rights and other assets, but it also broke out a separate offer for the purchase of just

12  the affected distribution rights for the MillerCoors brands.

13         14.    On behalf of DBI, IBG continued to provide offers until late October 2008;

14  however, it became apparent that negotiations would not be successful in resolving the parties'

15  dispute as to the fair market value of the affected distribution rights.  All negotiations have since

16  ended, and at Maita's request DBI has returned or destroyed all information provided.

17         15.    DBI, with IBG's assistance, also negotiated in good faith with the

18  terminated distributor in Placer County, Mussetter Distributing, Inc., to reach mutual agreement

19  on the fair market value of Mussetter's distributor rights.  Although these negotiations were

20  ultimately unsuccessful, unlike Maita, Mussetter actively negotiated and made various offers to

21  DBI's offers during these negotiations.

22        I declare under penalty of perjury under the laws of the United States of America

23  that the foregoing is true and correct and that I executed this Declaration on September __, 2009,

24  at _Hilton Head_ (city) _South Carolina_ (state).

25

26                          _Joe E. Thompson_

27                          JOE E. THOMPSON

28

-4-

**EXHIBIT A**

# EXHIBIT "A"

    
| From: | Susan Massey [smassey@ippolitochriston.com] |
|---|---|
| Sent: | Monday, October 06, 2008 6:31 PM |
| To: | Joe Thompson; TODD ARNOLD |
| Cc: | Andrew S. Christon; Susan Massey |
| Subject: | Maita Information |

**Attachments:** Maita Financial Information 2007-2008.xls

Joe and Todd:

The attached file contains the relevant historical and current year financial information for Maita.

With respect to the warehouse, here is a general description:

The warehouse and office facility used by Maita Distributors, Inc. is located at 3151 Edison Way in Redwood City, California. The facility is leased from a related party. The tilt-up concrete structure contains a total of 71,000 square feet, including approximately 10,000 square feet of office space and 61,000 of warehouse space, keg coolers and drive-through space. The warehouse is temperature-controlled and includes 15,000 square feet of refrigeration. There is also a 3,000 square-foot POS/Breakage building and onsite fuel pumps. The building is located on 4 acres of land. In addition to Maita's 4-acre land parcel, there is an additional 3 acres next door that is for sale.

Please let me know if you have questions regarding the attached information, or if I may be of further assistance in any way.

Susan

Susan G. Massey C.P.A., C.V.A.
smassey@ippolitochriston.com
v - 770.642.0016
f - 775.806.2414

**CONFIDENTIAL**
**DBI/MAITA 0064**

10/30/2008



CONFIDENTIAL
DBI/MAITA 0065



CONFIDENTIAL
DBI/MAITA 0066