E-Filed 10/19/09

CRAIG S. RITCHEY    (SBN 45829)
JOHN G. HURSH       (SBN 113149)
PATRICIA A. WELCH   (SBN 127889)
KAREN E. WENTZEL    (SBN 112179)
DORSEY & WHITNEY LLP
1717 Embarcadero Road
Palo Alto, CA 94303
Telephone: (650) 857-1717
Facsimile: (650) 857-1288
E-Mail:
efiling.pa@dorsey.com
ritchey.craig@dorsey.com
hursh.jack@dorsey.com
welch.patricia@dorsey.com
wentzel.karen@dorsey.com

Attorneys for Plaintiff
MAITA DISTRIBUTORS, INC. OF
SAN MATEO COUNTY

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| MAITA DISTRIBUTORS, INC. OF<br>SAN MATEO COUNTY, a California<br>corporation<br><br>Plaintiff,<br><br>v.<br><br>DBI BEVERAGE INC., a Tennessee<br>corporation<br><br>Defendant. | CASE NO. 5:09-CV-02318 RMW<br><br>~~[PROPOSED]~~ ORDER TO SEAL<br>DOCUMENTS FILED BY DEFENDANT IN<br>OPPOSITION TO PLAINTIFF MAITA<br>DISTRIBUTORS, INC. OF SAN MATEO<br>COUNTY'S MOTION FOR SUMMARY<br>JUDGMENT<br><br>HEARING DATE: October 30, 2009<br>TIME:     9:00 a.m.<br>DEPT:     Courtroom 6, 4th Floor<br><br>Complaint Filed (in State Court):<br>May 6, 2009<br>Matter Removed on:<br>May 26, 2009 |
| MILLERCOORS, LLC, a Delaware limited<br>liability company,<br><br>Intervenor. | Judge: Hon. Ronald M. Whyte |

TO ALL PARTIES HEREIN:

The Court has read and considered Defendant DBI Beverage, Inc. ("DBI")'s

Administrative Motion for a Sealing Order ("Motion") in Support of Its Opposition to Plaintiff

Maita Distributors, Inc. of San Mateo County's Motion for Summary Judgment ("Opposition")

-1-

REVISED [PROPOSED] ORDER TO SEAL DOCUMENTS FILED IN
OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT.

5:09-CV-02318 RMW

-2-

1   and Plaintiff Maita Distributors, Inc. of San Mateo County's Response ("Response") and the

2   accompanying declaration of Marcus Maita, pursuant to Local Rules 79-5 and 7-11, to file

3   selected documents comprised of highly sensitive information regarding Plaintiff Maita

4   Distributors, Inc. of San Mateo County ("Maita")'s private negotiations under seal.

5   Maita's interest in protecting information concerning private negotiations overcomes the

6   right of public access to these records, and is a compelling reason to support the sealing of the

7   records. If the records are not sealed, there is a substantial probability that Maita's interests in

8   the confidential information will be prejudiced or used for improper purposes. The sealing is

9   narrowly tailored in that it is limited only to those documents containing such information.

10  Compelling reasons appearing therefor, this Court finds pursuant to Civil L.R. 79-5, that:

11      (1)   The documents to be sealed, or portions thereof, are

12            entitled to protection under the law, that overcomes the
              right of public access to the record; and

13      (2)   The proposed sealing is narrowly tailored.

14  IT IS ORDERED THAT the Motion and Response to seal the highly confidential

15  information contained in and redacted from Exhibit A to the Declaration of Mark K. Slater in

16  Support of DBI's Opposition to Plaintiff Maita Distributors, Inc. of San Mateo County's Motion

17  for Summary Judgment, as shown in Exhibit 1 attached hereto, is GRANTED and that those

18  portions of documents are hereby ordered to be filed under seal. The unredacted exhibit

19  shall be filed under seal; the redacted exhibit shall be filed in
    the public file.

20  DATED:
    10/19/09

21  [signature]
    UNITED STATES DISTRICT JUDGE

22

23

24

25

26

27

28

EXHIBIT 1

1  SHEPPARD, MULLIN, RICHTER & HAMPTON LLP
2  A Limited Liability Partnership
   Including Professional Corporations
3  MARK K. SLATER, Cal. Bar No. 129742
   JONATHAN P. HERSEY, Cal. Bar No. 189240
4  ELISE K. SARA, Cal. Bar No. 253813
   MOLLY R. NEWLAND, Cal. Bar No. 244928
5  4 Embarcadero, 17th Floor
   San Francisco, California 94111-4109
6  Telephone:    415-434-9100
   Facsimile:    415-434-3947
7  mslater@sheppardmullin.com
   jhersey@sheppardmullin.com
8  esara@sheppardmullin.com
   mnewland@sheppardmullin.com
9  Attorneys for Defendant
10 DBI BEVERAGE INC.

11            UNITED STATES DISTRICT COURT

12    NORTHERN DISTRICT OF CALIFORNIA, SAN JOSE DIVISION

13

14 MAITA DISTRIBUTORS, INC. OF SAN        Case No.: 5:09-CV-2318 RMW (HRL)
   MATEO COUNTY, a California corporation,
15                                        DECLARATION OF MARK K. SLATER
              Plaintiff,                  IN SUPPORT OF DEFENDANT DBI
16                                        BEVERAGE INC.'S OPPOSITION TO
          v.                              PLAINTIFF MAITA DISTRIBUTORS,
17                                        INC. OF SAN MATEO'S MOTION FOR
   DBI BEVERAGE INC., a Tennessee         SUMMARY JUDGMENT
18 corporation,
                                          FILED UNDER SEAL
19            Defendant.
                                          Hearing date:  October 16, 2009
20                                        Time:           9:00 a.m.
                                          Dept.:          Courtroom 6, 4th Floor
21
22                                        Complaint Filed (in State Court):
                                          May 6, 2009
23
                                          Removed:
24                                        May 26, 2009
25
26
27
28

-1-

# DECLARATION OF MARK K. SLATER

I, Mark K. Slater, declare as follows:

1.     I am an attorney duly admitted to practice before this Court. I am a partner with Sheppard, Mullin, Richter, & Hampton LLP, attorneys of record for Defendant DBI Beverage Inc. ("DBI"). I have personal knowledge of the following facts, and, if called as a witness, I could and would competently testify thereto.

2.     This declaration is submitted in support of DBI's Opposition to Plaintiff Maita Distributors Inc. of San Mateo's ("Maita") Motion for Summary Judgment.

3.     DBI initiated arbitration with JAMS against Plaintiff as required section 25000.2 when the parties failed to reach an agreement over the fair market value of Plaintiff's distribution rights. Plaintiff refused to arbitrate.

4.     On February 6, 2009, DBI was forced to bring a Petition to Compel Arbitration ("Petition") in San Mateo Superior Court (the "San Mateo Action") against Plaintiff and two similarly situated distributors, Mussetter Distributing, Inc., and Elyxir Distributing, LLC (collectively "Former Distributors"). DBI was forced to bring the Petition because the Former Distributors refused to arbitrate and JAMS declined to continue with arbitration without a court order or their consent.

5.     On April 22, 2009, I took the deposition of Maita's person most knowledgeable, Mr. Marcus Maita ("Maita Deposition") in the San Mateo Action. The deposition transcript is marked "Confidential" pursuant to the stipulated protective order entered by the San Mateo Court on March 18, 2009. Attached hereto as Exhibit A is a true and correct copy of relevant excerpts from the Maita Deposition transcript.

6.     At the Maita Deposition, I introduced 23 exhibits consisting of documents produced by DBI and by Maita in the course of discovery in the San Mateo Action. These documents reflect the history of the negotiations that DBI engaged in with Maita pursuant to section 25000.2. Each of these documents is also marked "Confidential" pursuant to the stipulated protective order entered by the San Mateo Court on March 18, 2009.

-2-

1   Attached hereto as Exhibit B is a true and correct copy of Exhibit 2 to the

2   Maita Deposition.

3        8.   Attached hereto as Exhibit C is a true and correct copy of the Amendment

4   to Martlet Importing Co. Inc Distributor Agreement and Martlet Importing Co. Inc. Distributor

5   Agreement, produced in this matter by MillerCoors (Bates labeled MCC000001171-255).

6        9.   On September 16, 2009, I took the deposition of Andrew S. Christon.  The

7   deposition transcript is marked "Confidential" pursuant to the stipulated protective order entered

8   by the San Mateo Court on March 18, 2009.  Attached hereto as Exhibit D is a true and correct

9   copy of relevant excerpts from the Christon Deposition.

10        10.   Attached as Exhibit E is a true and correct copy of the Court's Notice of

11   Entry of Order Denying Petition to Compel Arbitration in this case, dated May 11, 2009 (attaching

12   as Exhibit A Order Denying Petition to Compel Arbitration).

13

14        I declare under penalty of perjury under the laws of the United States that the

15   foregoing is true and correct.

16        Executed September 25, 2009 at San Francisco, California.

17

18                                      /s/ Mark K. Slater
                                        ─────────────────────
19                                      Mark K. Slater

20

21

22

23

24

25

26

27

28

# EXHIBIT "A"

FILED UNDER SEAL

SUPERIOR COURT OF THE STATE OF CALIFORNIA

FOR THE COUNTY OF SAN MATEO

SOUTHERN BRANCH

DBI BEVERAGE, INC., a Tennessee
corporation, MILLERCOORS LLC, a
Delaware limited liability
company,

             Petitioners,

vs.                    CASE NO. 481035

MAITA DISTRIBUTORS, INC., a
California corporation, ELIXIR
DISTRIBUTING, LLC, a California
limited liability company,
MUSSETTER DISTRIBUTING, INC., a
California corporation,

             Respondents.

CONFIDENTIAL

VIDEOTAPED DEPOSITION OF MARCUS MAITA

San Francisco, California

Wednesday, April 22, 2009

**CERTIFIED COPY**

Reported by:

LORI STOKES

CSR No. 12732

Job No. 110357

SARNOFF COURT REPORTERS AND LEGAL TECHNOLOGIES
877.955.3855

19

| | | |
|---|---|---|
| 10:51:32 | 1 | Q. Did you ever talk to Andy Christson about |
| 10:51:34 | 2 | the termination letter? |
| 10:51:40 | 3 | A. The only thing I could possibly remember |
| 10:51:43 | 4 | is just telling him it was coming at some point. |
| 10:51:52 | 5 | Q. Can you please look at page 1 of that |
| 10:51:55 | 6 | termination letter. I'm going to refer to |
| 10:51:58 | 7 | something during the deposition called a Bates |
| 10:52:01 | 8 | label. You'll see a stamped number in the bottom |
| 10:52:03 | 9 | right. It's page 1 of the letter, and the Bates |
| 10:52:05 | 10 | label is MAI6, just so we're looking at the same |
| 10:52:08 | 11 | thing. |
| 10:52:10 | 12 | If I could please direct your attention |
| 10:52:12 | 13 | to the bottom, you'll see a sentence written there |
| 10:52:15 | 14 | that reads, from Miller to you -- I'm sorry, to |
| 10:52:20 | 15 | your father, we appreciate your corporation in |
| 10:52:23 | 16 | negotiating in good faith with DBI Beverage to |
| 10:52:28 | 17 | ensure an efficient transfer of the distribution |
| 10:52:31 | 18 | rights. |
| 10:52:31 | 19 | Do you see that? |
| 10:52:32 | 20 | A. I'm sorry. |
| 10:52:33 | 21 | Q. Take your time. |
| 10:52:43 | 22 | A. Okay. |
| 10:52:45 | 23 | Q. You have that sentence in mind now? |
| 10:52:47 | 24 | A. Yes. |
| 10:52:51 | 25 | Q. Did Maita Distributors negotiate in good |

20

```
 1   10:52:55   faith with DBI Beverage in your mind?
 2   10:52:59        A.   In my mind, yes.
 3   10:53:01        Q.   At all times?
 4   10:53:03        A.   I believe so.
 5   10:53:10        Q.   At this point in time -- that is when the
 6   10:53:13   termination letter was received -- had anyone
 7   10:53:16   conveyed formally, informally, indication,
 8   10:53:21   suggestion to DBI what they thought the value of
 9   10:53:26   Matta Distributors might be?
10   10:53:31        A.   I'm sorry.  After receiving this letter?
11   10:53:34        Q.   Around the time of the letter.
12   10:53:35        A.   Around the time of the letter?
13   10:53:37        Q.   Let me reask it so we have a clean
14   10:53:40   record.  Up to the date of the letter, September 2,
15   10:53:43   2008, had anyone on behalf of Matta conveyed to
16   10:53:49   anyone on the DBI side of the table what they
17   10:53:50   thought the value of the Matta distributorship was?
18   10:53:54        A.   Not that I can recall.
19   10:53:56        Q.   And you'll see when we go through the
20   10:53:59   exhibits today, there are formal offer letters,
21   10:54:02   there are informal suggestions.  And I mean by any
22   10:54:06   means.
23   10:54:08        A.   Uh-huh.  I can't remember.
24   10:54:40        MR. SLATER:  I'd like to mark as
25   10:54:42   Exhibit 4 a document Bates labeled from MAI18 to
```

| | | |
|---|---|---|
| 11:02:44 | 1 | A.  Well, in bridging that gap and filling |
| 11:02:49 | 2 | that hole with our company, there's things you can |
| 11:02:52 | 3 | do to structure your company or that DBI could do |
| 11:02:56 | 4 | in terms of being creative with manpower, |
| 11:03:01 | 5 | operational costs, warehousing costs, fuel costs, |
| 11:03:06 | 6 | utility costs. |
| 11:03:08 | 7 | I mean, there's plenty of synergies that |
| 11:03:13 | 8 | can be created that contribute financially to DBI. |
| 11:03:20 | 9 | Q.  Let me direct your attention to the |
| 11:03:23 | 10 | sentence below -- two sentences, I suppose.  It |
| 11:03:28 | 11 | reads, in making an offer for the, cap R, Rights, |
| 11:03:31 | 12 | please separately allocate the proposed purchase |
| 11:03:34 | 13 | price to the MillerCoors rights, the Crown rights |
| 11:03:37 | 14 | and all other rights DBI proposes to purchase. |
| 11:03:41 | 15 | Do you see that? |
| 11:03:43 | 16 | A.  Is that on the same page? |
| 11:03:45 | 17 | Q.  It's two sentences down on the same page. |
| 11:03:48 | 18 | A.  Yes. |
| 11:03:49 | 19 | Q.  Why was that beneficial to Maita? |
| 11:03:56 | 20 | MR. HURSH:  Why did they want that? |
| 11:03:59 | 21 | BY MR. SLATER: |
| 11:04:01 | 22 | Q.  Why was it -- yes.  We can do it in that |
| 11:04:04 | 23 | order. |
| 11:04:06 | 24 | Why did Maita request that? |
| 11:04:09 | 25 | A.  Well, that request was done -- it was |

MARCUS MATTA
CONFIDENTIAL

04/22/09

1    after discussion with Andy Christon.  He viewed it
2    as the more beneficial way to request numbers for
3    the proposed purchase price.  So he -- he just
4    believed that was the best way to do it.
5    Q.   The best way for Matta, right?
6    A.   Yes.
7    Q.   What benefits did he think would accrue
8    to Matta by having an offer come back structured
9    this way?
10   MR. HURSH:  Objection.  That calls for
11   speculation.
12   You can answer.  You can answer to what
13   he told you.  You can't answer what he was
14   thinking.
15   THE WITNESS:  Okay.  Well, one of the
16   issues was that the termination letter, this whole
17   situation is pertinent to Miller and Coors.  This
18   has nothing to do with our entire business.
19   So in one aspect, I wanted to get a value
20   for MillerCoors.  With everything else pulled out,
21   including Crown and others, to explore other
22   potential avenues, other opportunities out there
23   for our business and either exploring offering
24   these brands to competing distributors or other
25   scenarios.

| # | Time | |
|---|------|---|
| 1 | 11:05:41 | BY MR. SLATER: |
| 2 | 11:05:41 | Q. So in other words, you could go to |
| 3 | 11:05:44 | another potential buyer knowing you had an offer |
| 4 | 11:05:47 | that was distributor- or line-specific, right? |
| 5 | 11:05:51 | A. Yes. |
| 6 | 11:05:53 | Q. And that was a benefit to Maita, right? |
| 7 | 11:05:55 | A. Yes. |
| 8 | 11:05:56 | Q. And you saw nothing inappropriate in |
| 9 | 11:05:58 | requesting or even requiring that an offer that |
| 10 | 11:06:01 | came from DBI be structured that way, right? |
| 11 | 11:06:06 | A. That's how we wanted the offer. |
| 12 | 11:06:14 | Q. It's written here, furthermore, it is |
| 13 | 11:06:17 | anticipated that DBI's proposed purchase of Maita's |
| 14 | 11:06:21 | core business of Millercoors rights will also |
| 15 | 11:06:21 | include the purchase of most of the tangible assets |
| 16 | 11:06:27 | currently used in the conduct of Maita's total |
| 17 | 11:06:30 | business. |
| 18 | 11:06:30 | Do you see that? |
| 19 | 11:06:31 | A. Yes. |
| 20 | 11:06:32 | Q. Do you know why that was anticipated? |
| 21 | 11:06:35 | A. From what we've heard, that they do total |
| 22 | 11:06:38 | asset purchases of businesses. |
| 23 | 11:06:41 | Q. Now, the tangible assets were never |
| 24 | 11:06:44 | really a point of contention or dispute between the |
| 25 | 11:06:47 | parties, were they? |

SARNOFF COURT REPORTERS AND LEGAL TECHNOLOGIES
877.955.3855

```
 1   11:51:40   BY MR. SLATER:
 2   11:51:40        Q.   And you have no reason to think that he
 3   11:51:42   did, do you?
 4   11:51:43        A.   No.
 5   11:51:44        Q.   Was this Confidential Offering Memorandum
 6   11:51:47   prepared for DBI?
 7   11:51:51        A.   Yes.
 8   11:52:01        Q.   This Offering Memorandum does not
 9   11:52:05   indicate a purchase price that Matta is willing to
10   11:52:10   accept, does it?
11   11:52:15        A.   No.
12   11:52:19        Q.   At this point in time, did Matta have a
13   11:52:22   purchase price in mind that it would accept?
14   11:52:35        A.   Probably not an exact purchase price, but
15   11:52:38   a range.
16   11:52:39        Q.   And what was that range?
17   11:52:48        A.   At the time of this, we would have highly
18   11:53:03   considered any offer in the ███████████████
19   11:53:09   ███████████████████
20   11:53:12        Q.   And for what?
21   11:53:14        A.   For distribution rights.
22   11:53:16        Q.   So just so we're saying the same thing,
23   11:53:19   for all distribution rights?
24   11:53:21        A.   Yes.
25   11:53:24        Q.   Can you please turn to page 2 of the
```

MARCUS MATTA
CONFIDENTIAL

04/22/09

| | | |
|---|---|---|
| 12:58:57 | 1 | believe. Exhibit 6 is a two-page document Bates |
| 12:59:00 | 2 | labeled DB1/Maita 45, DB1/Maita 46. |
| 12:59:05 | 3 | (Whereupon, Exhibit 6 was marked for |
| 12:59:05 | 4 | identification.) |
| 12:59:34 | 5 | BY MR. SLATER: |
| 12:59:42 | 6 | Q. Had a chance to look at it? |
| 12:59:43 | 7 | A. Uh-huh. |
| 12:59:45 | 8 | Q. If I could just ask you to look at page 2 |
| 12:59:47 | 9 | of the document entitled, Maita Distributors Sales |
| 12:59:49 | 10 | Stat BY 2007. |
| 12:59:52 | 11 | Do you see that? |
| 12:59:52 | 12 | A. Yes. |
| 12:59:53 | 13 | Q. Do you know who prepared this document? |
| 12:59:55 | 14 | And I mean just this page. |
| 12:59:58 | 15 | A. This was prepared by my controller, |
| 13:00:02 | 16 | Ansalmo. |
| 13:00:04 | 17 | Q. And what is Ansalmo's exact title? |
| 13:00:07 | 18 | A. Controller, actually. |
| 13:00:09 | 19 | Q. Controller? |
| 13:00:10 | 20 | A. Yes. |
| 13:00:11 | 21 | Q. As you look at these numbers, do you have |
| 13:00:13 | 22 | any reason to think they're re inaccurate? |
| 13:00:16 | 23 | A. No. |
| 13:00:35 | 24 | Q. At this point in time -- that is, the |
| 13:00:39 | 25 | date on this e-mail, Thursday, October 9, 2008 -- |

```
 1   A.  I laughed.  No, I called -- I called Andy       13:07:41
 2   and asked him if he had gotten it.  And he did.      13:07:52
 3   And we just viewed it as, you know, not acceptable.  13:08:05
 4      Q.  Why wasn't it acceptable?                     13:08:10
 5      A.  The price wasn't consistent with what we      13:08:15
 6   were looking for.                                    13:08:19
 7      Q.  At this point in time, around October 15,     13:08:20
 8   2008, what sort of price were you looking for?       13:08:23
 9      MR. HURSH:  You're talking about the date         13:08:29
10   of the letter, not when he talked to Andy now,       13:08:30
11   correct?                                             13:08:33
12      MR. SLATER:  Good point.  Yeah, let's             13:08:35
13   clarify that.  I mean, if it changed.                13:08:36
14      MR. HURSH:  I don't know.                         13:08:40
15      MR. SLATER:  Let me set up some                   13:08:42
16   foundation to make this easier.                      13:08:44
17      Q.  How long after getting the letter did you     13:08:46
18   talk to Andy?                                        13:08:48
19      A.  After I got the e-mail, I think pretty        13:08:53
20   much immediately.  I called him or e-mailed him.  I  13:09:00
21   can't remember which one I did.  But I talked to     13:09:03
22   him that day.                                        13:09:04
23      Q.  Was that October 22, October 23, in that      13:09:09
24   time frame?  If you know.                            13:09:15
25      A.  Somewhere around then.  It's whenever we
```

SARNOFF COURT REPORTERS AND LEGAL TECHNOLOGIES
877.955.3855

66

```
13:09:17   1    got the offer.  It was basically -- basically that
13:09:22   2    day we talked.
13:09:23   3        Q.  And that day, what was the number that
13:09:26   4    you had in mind?
13:09:34   5        A.  That day, we were still basing our
13:09:37   6    evaluation the same way we had all along, based on
13:09:40   7    a range that was already established with Andy.
13:09:45   8        Q.  And what was that range?
13:09:53   9        A.  Well, the range was ███████████████
13:10:01  10    ██████
13:10:02  11        Q.  Did that ever change over time?
13:10:05  12        A.  No.
13:10:07  13        Q.  So when you got this letter, you thought
13:10:11  14    the dollar amount of the offer was too low, right?
13:10:15  15        A.  Yes.
13:10:18  16        Q.  And did you really laugh when you got it?
13:10:19  17        A.  No.
13:10:21  18        Q.  Is there anything else about it that you
13:10:23  19    found objectionable?
13:10:31  20        A.  The only thing I found objectionable is
13:10:34  21    that it wasn't broken out the way Andy had
13:10:39  22    requested.
13:10:41  23        Q.  Up to this point in time, when you
13:10:43  24    received this letter -- and the e-mail would tell
13:10:47  25    us the exact day you got it, right?
```

```
13:10:50   1      A.  Yes.
13:10:50   2      Q.  Had you ever -- or anyone on the Ippolito
13:10:54   3   side -- ever conveyed to DEI what they thought an
13:10:59   4   acceptable number was?
13:11:03   5      A.  Not that I recall.
13:11:05   6      Q.  Can you please look in the middle of the
13:11:08   7   letter, second paragraph.
13:11:09   8      A.  Uh-huh.
13:11:10   9      Q.  There's a sentence here that reads, we
13:11:11  10   have, however, calculated synergies we believe
13:11:15  11   could be realized based upon the information we
13:11:19  12   have received to data including an organization
13:11:21  13   chart with compensation.
13:11:23  14      Do you see that?
13:11:24  15      A.  Uh-huh.
13:11:26  16      Q.  Do you recall any discussions between the
13:11:30  17   Maita side and the DEI side discussing what those
13:11:35  18   synergies were and whether the parties had
13:11:39  19   different perceptions about what those synergies
13:11:42  20   might be?
13:11:50  21      A.  To the extent of what exact synergies can
13:11:54  22   be realized, no.  I don't recall any specific
13:11:57  23   discussions about what they could be.
13:11:59  24      Q.  Do you recall that the parties had --
13:12:02  25   apparently held different perceptions about what
```

```
 1   13:21:20    possible counter with Andy Christenson?
 2   13:21:29         A.   Not that I can remember.
 3   13:21:32         Q.   To your knowledge, no brand-only counter
 4   13:21:35    was ever made from the Malta side to the DBI side;
 5   13:21:40    is that right?
 6   13:21:53         A.   When you say offer, you just mean one
 7   13:21:55    specific amount in terms of counter?
 8   13:21:58         Q.   Here is where I'm -- here is what I'd
 9   13:22:01    like to know:  This e-mail reflects and is
10   13:22:04    described as a brand-only offer for the Miller
11   13:22:08    Legacy brand and the Molson Legacy brand
12   13:22:10    portfolios.
13   13:22:12         You see that, right?
14   13:22:14         A.   Right.
15   13:22:14         Q.   Did anyone on the Malta side ever come up
16   13:22:17    with a counteroffer to this brand-only offer?
17   13:22:26         A.   At this point, no.
18   13:22:27         Q.   Ever.  In the discussions with the DBI
19   13:22:32    side.
20   13:22:53         A.   By e-mail confirmation or open general
21   13:22:57    discussion or --
22   13:22:58         Q.   Any means.
23   13:23:00         A.   I can't remember if a specific amount was
24   13:23:03    countered to them.
25   13:23:05         Q.   Was a counter of any form in your mind
```

MARCUS MAITA
CONFIDENTIAL

04/22/09

SARNOFF COURT REPORTERS AND LEGAL TECHNOLOGIES
877.955.3855

| Time | Line | |
|---|---|---|
| 13:32:37 | 1 | Q. Did you see this letter before it was |
| 13:32:39 | 2 | sent? |
| 13:32:42 | 3 | A. I can't recall. |
| 13:32:43 | 4 | Q. Did you discuss the subject matter of the |
| 13:32:45 | 5 | letter with Mr. Christon before it was sent? |
| 13:32:55 | 6 | A. Yes. |
| 13:32:56 | 7 | Q. What was the substance of that |
| 13:32:58 | 8 | conversation? |
| 13:33:02 | 9 | A. I can't recall the exact substance |
| 13:33:04 | 10 | matter. Just continuous frustration on our side |
| 13:33:08 | 11 | that -- at the way this negotiation was going. |
| 13:33:21 | 12 | It wasn't -- well, I guess it was just |
| 13:33:32 | 13 | based on the frustration how the negotiations were |
| 13:33:37 | 14 | going so far. |
| 13:33:38 | 15 | Q. In your mind, up to that point in time, |
| 13:33:41 | 16 | October 31, 2008, Matta had negotiated in good |
| 13:33:46 | 17 | faith, right? |
| 13:33:47 | 18 | A. I believe so. |
| 13:33:48 | 19 | Q. And to this point in time, October 31, |
| 13:33:50 | 20 | 2008, Matta had made no offer or counter of any |
| 13:33:55 | 21 | sort for either the sale of its entire business or |
| 13:33:58 | 22 | any of the brand portfolios; is that right? |
| 13:34:07 | 23 | A. I don't think we ever got to that point. |
| 13:34:09 | 24 | Q. My question was, but you never made a |
| 13:34:12 | 25 | counter or an indication of any sort to the DBI |

MARCUS MATTA
CONFIDENTIAL

04/22/09

MARCUS MATTA
CONFIDENTIAL

```
13:37:53   1   Bates labeled MAI67.
13:37:57   2       Q.   Mr. Matta, have you seen this letter
           3   before?
13:38:00   4       A.   Yes.
13:38:04   5       Q.   To your knowledge, was there any counter
13:38:06   6   or any response to this letter from the Matta side
13:38:11   7   to the DBI side?
13:38:14   8       A.   Not that I can recall.
13:38:43   9       Q.   I just need to check my notes on
13:38:45  10   something.
13:38:47  11            MR. SLATER:  Exhibit 17, a document Bates
13:38:51  12   labeled MAI68.
13:38:54  13            (Whereupon, Exhibit 17 was marked for
13:38:54  14   identification.)
13:39:15  15            THE WITNESS:  Okay.
13:39:16  16   BY MR. SLATER:
13:39:16  17       Q.   You wrote this e-mail, right?
13:39:18  18       A.   Yes.
13:39:19  19       Q.   Why did you write it?
13:39:20  20       A.   Because, at the time, the discussions
13:39:23  21   weren't getting anywhere.  I think there were
13:39:26  22   frustrations on both sides.  And I felt we could
13:39:32  23   maybe make some progress if Patty and myself got a
13:39:38  24   little more involved.
13:39:40  25       Q.   Was there a reason you selected Patty?
```

SARNOFF COURT REPORTERS AND LEGAL TECHNOLOGIES
877.955.3855

SARNOFF COURT REPORTERS AND LEGAL TECHNOLOGIES
877.955.3855

89

| | | |
|---|---|---|
| 13:59:37 | 1 | left it at -- what was it?  I think there was some |
| 13:59:45 | 2 | line item expenses they wanted to get.  So I said, |
| 13:59:48 | 3 | I'll get those to you right away, which I did. |
| 13:59:51 | 4 | Q.  And I believe you just testified that, in |
| 13:59:53 | 5 | the course of that meeting, Mr. Skinner made |
| 13:59:56 | 6 | another offer on behalf of DB1? |
| 13:59:58 | 7 | A.  Uh-huh. |
| 14:00:00 | 8 | Q.  Do you recall approximately what it was |
| 14:00:01 | 9 | or how it was made? |
| 14:00:05 | 10 | A.  It was pretty much right at the beginning |
| 14:00:08 | 11 | of the meeting.  And it was done -- it was broken |
| 14:00:11 | 12 | out as a multiple of EBITDA and just based on -- |
| 14:00:23 | 13 | well, yeah, our EBITDA with their perceived |
| 14:00:28 | 14 | synergies put in it and multiplied by -- I want to |
| 14:00:35 | 15 | [REDACTED] say |
| 14:00:39 | 16 | Q.  In the course of that meeting, did you |
| 14:00:42 | 17 | convey any number you would accept on behalf of |
| 14:00:45 | 18 | Matter? |
| 14:00:45 | 19 | A.  No. |
| 14:00:46 | 20 | Q.  Did that meeting actually take place -- |
| 14:00:48 | 21 | forgive me if I asked you this. |
| 14:00:52 | 22 | Did it actually take place on Monday, |
| 14:00:56 | 23 | November 24? |
| 14:00:58 | 24 | A.  Yes, it did. |
| 14:01:35 | 25 | MR. SLATER:  Can you mark this as next in |

| | | |
|---|---|---|
| 14:14:00 | 1 | 15, right? |
| 14:14:02 | 2 | A.  Uh-huh. |
| 14:14:03 | 3 | Q.  And your response is reflected in the |
| 14:14:05 | 4 | e-mail above, right? |
| 14:14:07 | 5 | A.  Yes. |
| 14:14:08 | 6 | Q.  And was it your intention writing that |
| 14:14:10 | 7 | e-mail to terminate the discussions? |
| 14:14:26 | 8 | A.  At that point, yes. |
| 14:14:28 | 9 | Q.  At that point, Monday, December 15, when |
| 14:14:31 | 10 | you wrote this e-mail, is it fair to say that Maita |
| 14:14:35 | 11 | had provided no numbers to the DBI side that would |
| 14:14:39 | 12 | have been acceptable for the purchase of either its |
| 14:14:46 | 13 | business or the brand portfolio? |
| 14:14:49 | 14 | A.  Had Maita provided -- |
| 14:14:52 | 15 | Q.  The Maita side. |
| 14:14:56 | 16 | A.  The Maita side? |
| 14:14:57 | 17 | Q.  Yeah. |
| 14:14:58 | 18 | A.  Not a specific amount, no. |
| 14:14:59 | 19 | Q.  Had any offers been conveyed -- I'm going |
| 14:15:01 | 20 | to say -- offers obviously came from the DBI and |
| 14:15:05 | 21 | IBG side.  And it was your judgment the numbers |
| 14:15:09 | 22 | weren't high enough, right? |
| 14:15:11 | 23 | A.  Right. |
| 14:15:12 | 24 | Q.  Had the Maita side ever provided anything |
| 14:15:15 | 25 | like a counteroffer back to the DBI side? |

96

| | | |
|---|---|---|
| 14:15:19 | 1 | A.   Nothing in writing.  No true official |
| 14:15:32 | 2 | counteroffer at this point.  Because we knew we |
| 14:15:36 | 3 | were still quite a ways away. |
| 14:15:39 | 4 | And in my meeting with them in |
| 14:15:41 | 5 | Sacramento, I pretty much conveyed that.  That |
| 14:15:44 | 6 | we're still a ways off, you know, with these |
| 14:15:47 | 7 | offers.  Hopefully we can close the gap. |
| 14:15:50 | 8 | And without giving them the specific, you |
| 14:15:52 | 9 | know, amount, I was saying that the gap was still |
| 14:16:02 | 10 | pretty wide.  They understood it was still pretty |
| 14:16:06 | 11 | wide. |
| 14:16:07 | 12 | Q.   Did you convey anything in the Sacramento |
| 14:16:09 | 13 | meeting about what number would be acceptable to |
| 14:16:11 | 14 | the Matta side? |
| 14:16:13 | 15 | A.   Not the specific number. |
| 14:16:15 | 16 | Q.   I'm sorry, I shouldn't speak over your |
| 14:16:17 | 17 | answers. |
| 14:16:18 | 18 | A.   I apologize. |
| 14:16:20 | 19 | Q.   Not at all. |
| 14:16:21 | 20 | What did you convey generally about -- |
| 14:16:22 | 21 | other than what you've testified to -- about what |
| 14:16:25 | 22 | would be acceptable to Matta? |
| 14:16:31 | 23 | A.   Nothing completely specific.  Just that |
| 14:16:33 | 24 | the gap was still pretty wide.  And that was -- |
| 14:16:41 | 25 | that was pretty much it. |

SARNOFF COURT REPORTERS AND LEGAL TECHNOLOGIES
877.955.3855

| | |
|---|---|
| 14:15:19 | 1 | A. Nothing in writing. No true official |
| 14:15:32 | 2 | counteroffer at this point. Because we knew we |
| 14:15:36 | 3 | were still quite a ways away. |
| 14:15:39 | 4 | And in my meeting with them in |
| 14:15:41 | 5 | Sacramento, I pretty much conveyed that. That |
| 14:15:44 | 6 | we're still a ways off, you know, with these |
| 14:15:47 | 7 | offers. Hopefully we can close the gap. |
| 14:15:50 | 8 | And without giving them the specific, you |
| 14:15:52 | 9 | know, amount, I was saying that the gap was still |
| 14:16:02 | 10 | pretty wide. They understood it was still pretty |
| 14:16:06 | 11 | wide. |
| 14:16:07 | 12 | Q. Did you convey anything in the Sacramento |
| 14:16:09 | 13 | meeting about what number would be acceptable to |
| 14:16:12 | 14 | the Maita side? |
| 14:16:13 | 15 | A. Not the specific number. |
| 14:16:15 | 16 | Q. I'm sorry, I shouldn't speak over your |
| 14:16:17 | 17 | answers. |
| 14:16:18 | 18 | A. I apologize. |
| 14:16:20 | 19 | Q. Not at all. |
| 14:16:21 | 20 | What did you convey generally about -- |
| 14:16:22 | 21 | other than what you've testified to -- about what |
| 14:16:23 | 22 | would be acceptable to Maita? |
| 14:16:31 | 23 | A. Nothing completely specific. Just that |
| 14:16:33 | 24 | the gap was still pretty wide. And that was -- |
| 14:16:41 | 25 | that was pretty much it. |

SARNOFF COURT REPORTERS AND LEGAL TECHNOLOGIES
877.955.3855

```
14:14:00   1        15, right?
14:14:02   2        A.   Uh-huh.
14:14:03   3        Q.   And your response is reflected in the
14:14:05   4   e-mail above, right?
14:14:07   5        A.   Yes.
14:14:08   6        Q.   And was it your intention writing that
14:14:01   7   e-mail to terminate the discussions?
14:14:26   8        A.   At that point, yes.
14:14:28   9        Q.   At that point, Monday, December 15, when
14:14:31  10   you wrote this e-mail, is it fair to say that Matta
14:14:35  11   had provided no numbers to the DBI side that would
14:14:39  12   have been acceptable for the purchase of either its
14:14:46  13   business or the brand portfolio?
14:14:49  14        A.   Had Matta provided --
14:14:52  15        Q.   The Matta side.
14:14:56  16        A.   The Matta side?
14:14:57  17        Q.   Yeah.
14:14:58  18        A.   Not a specific amount, no.
14:14:59  19        Q.   Had any offers been conveyed -- I'm going
14:15:01  20   to say -- offers obviously came from the DBI and
14:15:05  21   IBG side.  And it was your judgment the numbers
14:15:09  22   weren't high enough, right?
14:15:11  23        A.   Right.
14:15:12  24        Q.   Had the Matta side ever provided anything
14:15:15  25   like a counteroffer back to the DBI side?
```

```
13:37:53   1    Bates labeled MAI67.
13:37:57   2         Q.   Mr. Matta, have you seen this letter
           3    before?
13:38:00   4         A.   Yes.
13:38:04   5         Q.   To your knowledge, was there any counter
13:38:06   6    or any response to this letter from the Matta side
13:38:11   7    to the DBI side?
13:38:14   8         A.   Not that I can recall.
13:38:43   9         Q.   I just need to check my notes on
13:38:45  10    something.
13:38:47  11         MR. SLATER:   Exhibit 17, a document Bates
13:38:51  12    labeled MAI68.
13:38:54  13         (Whereupon, Exhibit 17 was marked for
13:38:56  14    identification.)
13:39:15  15         THE WITNESS:   Okay.
13:39:16  16    BY MR. SLATER:
13:39:16  17         Q.   You wrote this e-mail, right?
13:39:18  18         A.   Yes.
13:39:19  19         Q.   Why did you write it?
13:39:20  20         A.   Because, at the time, the discussions
13:39:23  21    weren't getting anywhere.  I think there were
13:39:26  22    frustrations on both sides.  And I felt we could
13:39:32  23    maybe make some progress if Patty and myself got a
13:39:38  24    little more involved.
13:39:40  25         Q.   Was there a reason you selected Patty?
```

MARCUS MATTA
CONFIDENTIAL

04/22/09

```
 1  13:09:17   got the offer.  It was basically -- basically that
 2  13:09:22   day we talked.
 3  13:09:23       Q.  And that day, what was the number that
 4  13:09:26   you had in mind?
 5  13:09:34       A.  That day, we were still basing our
 6  13:09:37   evaluation the same way we had all along, based on
 7  13:09:40   a range that was already established with Andy.
 8  13:09:45       Q.  And what was that range?
 9  13:09:53       A.  Well, the range was still ████████████████
10  13:10:01
11  13:10:02       Q.  Did that ever change over time?
12  13:10:05       A.  No.
13  13:10:07       Q.  So when you got this letter, you thought
14  13:10:11   the dollar amount of the offer was too low, right?
15  13:10:15       A.  Yes.
16  13:10:16       Q.  And did you really laugh when you got it?
17  13:10:19       A.  No.
18  13:10:21       Q.  Is there anything else about it that you
19  13:10:23   found objectionable?
20  13:10:31       A.  The only thing I found objectionable is
21  13:10:34   that it wasn't broken out the way Andy had
22  13:10:39   requested.
23  13:10:41       Q.  Up to this point in time, when you
24  13:10:43   received this letter -- and the e-mail would tell
25  13:10:47   us the exact day you got it, right?
```

MARCUS MAITA
CONFIDENTIAL

04/22/09