CRAIG S. RITCHEY   (SBN 45829)
JOHN G. HURSH   (SBN 113149)
PATRICIA A. WELCH   (SBN 127889)
KAREN E. WENTZEL   (SBN 112179)
DORSEY & WHITNEY LLP
1717 Embarcadero Road
Palo Alto, CA 94303
Telephone: (650) 857-1717
Facsimile: (650) 857-1288
E-Mail:   efilingpa@dorsey.com
          ritchey.craig@dorsey.com
          hursh.jack@dorsey.com
          welch.patricia@dorsey.com
          wentzel.karen@dorsey.com

E-Filed 11/17/09

Attorneys for Plaintiff
MAITA DISTRIBUTORS, INC. OF
SAN MATEO COUNTY

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

MAITA DISTRIBUTORS, INC. OF
SAN MATEO COUNTY, a California
corporation

         Plaintiff,

v.

DBI BEVERAGE INC., a Tennessee
corporation,

         Defendant.

MILLERCOORS, LLC, a Delaware limited
liability company,

         Intervenor.

CASE NO. 5:09-CV-02318 RMW

[PROPOSED] ORDER SEALING PORTIONS
OF DEFENDANT DBI'S REVISED TRIAL
BRIEF AND REVISED PROPOSED
FINDINGS OF FACT AND CONCLUSIONS
OF LAW

TRIAL DATE:    November 17, 2009
TIME:          9:00 a.m.
DEPT:          Courtroom 6, 4th Floor

Matter Removed on:
May 26, 2009

JUDGE:  HON. RONALD M. WHYTE

**TO ALL PARTIES HEREIN:**

The Court has read and considered Defendant DBI Beverage, Inc. ("DBI")'s

Administrative Motion for a Sealing Order in Support of Its Amended Findings of Fact and Law

and Trial Brief ("Motion") and Plaintiff Maita Distributing, Inc. of San Mateo County ("Maita")'s

Response to the Motion ("Response"), and the accompanying declaration of Marcus Maita,

-1-

5:09-CV-02318 RMW

1   pursuant    to Local Rules 79-5 and 7-11, to file selected documents comprised of highly sensitive

2   information regarding Maita's private negotiations, financial information, and trade secrets under

3   seal.

4        Maita's interest in protecting information concerning private negotiations, financial

5   information, and trade secrets overcomes the right of public access to these records, and are

6   compelling reasons to support the sealing of the documents.  If the documents are not sealed,

7   there is a substantial probability that Maita's interests in the confidential information, financial

8   information, and trade secrets will be prejudiced.  The sealing is narrowly tailored in that it is

9   limited to line-by-line redactions of confidential information contained in those documents.

10  Compelling reasons appearing therefor, this Court finds pursuant to Civil L.R. 79-5, that:

      (1)    The documents to be sealed, or portions thereof, are
11                entitled to protection under the law, that overcomes the
12                right of public access to the record; and

      (2)    The proposed sealing is narrowly tailored.
13

14       IT IS ORDERED THAT the Motion and Response (1) to seal the highly confidential

15  information contained in and redacted from DBI's Revised Trial Brief, as shown in Exhibit 1

16  attached hereto; and (2) to seal the highly confidential information contained in and redacted

17  from DBI's Revised Proposed Findings of Fact and Conclusions of Law, as shown in Exhibit 2

18  attached hereto is GRANTED and that those portions of documents are hereby ordered to be

19  filed under seal.  Unredacted copies of the documents shall be filed under seal; redacted copies

20  shall be filed in the public record.

21  DATED:   11/17/09

22

23  

                           UNITED STATES DISTRICT JUDGE
24

25

26

27

28

-2-

PROPOSED] ORDER SEALING PORTIONS OF DEFENDANT                          5:09-CV-02318 RMW
DBI'S REVISED TRIAL BRIEF AND REVISED PROPOSED FINDINGS OF FACT
AND CONCLUSIONS OF LAW

EXHIBIT 1

1  SHEPPARD, MULLIN, RICHTER & HAMPTON LLP
      A Limited Liability Partnership
2      Including Professional Corporations
    MARK K. SLATER, Cal. Bar No. 129742
3  JONATHAN P. HERSEY, Cal. Bar No. 189240
    ELISE K. SARA, Cal. Bar No. 253813
4  MOLLY R. NEWLAND, Cal. Bar No. 244928
    4 Embarcadero, 17th Floor
5  San Francisco, California  94111-4109
    Telephone:     415-434-9100
6  Facsimile:     415-434-3947
    mslater@sheppardmullin.com
7  jhersey@sheppardmullin.com
    esara@sheppardmullin.com
8  mnewland@sheppardmullin.com

9  Attorneys for Defendant
    DBI BEVERAGE INC.

10

11              UNITED STATES DISTRICT COURT

12        NORTHERN DISTRICT OF CALIFORNIA, SAN JOSE DIVISION

13

14  MAITA DISTRIBUTORS, INC. OF SAN          Case No.: 5:09-CV-2318 RMW (HRL)
    MATEO COUNTY, a California corporation,
15                                            **DEFENDANT DBI BEVERAGE INC.'S
                            Plaintiff,        REVISED TRIAL BRIEF**
16
          v.                                  **UNREDACTED VERSION**
17
    DBI BEVERAGE INC., a Tennessee
18  corporation,                              Trial Date:    November 17, 2009
                                              Time:          9:00 a.m.
19                          Defendant.        Dept.:         Courtroom 6, 4th Floor

20                                            Complaint Filed (in State Court):
                                              May 6, 2009
21
                                              Removed:
22                                            May 26, 2009

23  MILLERCOORS, LLC, a Delaware limited
    liability company,
24
                            Intervenor.
25

26

27

28

DEFENDANT DBI'S REVISED TRIAL BRIEF

1  The Court invited the parties to submit revised Trial Briefs focusing on the single
2  remaining claim for trial, namely plaintiff Maita Distributors Inc. of San Mateo County's
3  ("Maita's") claim that under California Business and Professions Code section 25000.2 ("section
4  25000.2"), good faith negotiation is a condition precedent to arbitration, and that defendant DBI
5  Beverage Inc. ("DBI") allegedly failed to negotiate in good faith.  DBI therefore respectfully
6  submits this revised Trial Brief.

## I. INTRODUCTION

8  This trial turns on application of the following sentence from section 25000.2(d): "The
9  successor beer manufacturer's designee *and* the existing beer wholesaler shall *negotiate* in good
10  faith." (Emphasis added.)

11  Maita contends that DBI did not negotiate in good faith, and thus may not proceed to
12  arbitration.  As noted by this Court, [Maita's] sole argument "reduce[s] to the assertion that DBI
13  did not negotiate in good faith because Maita did not receive any offer to purchase the distribution
14  rights within the first thirty days."[1]

15  There are several fundamental flaws with this argument, each dispositive.

16  First is the statutory construction.  "Negotiate" means "to confer with another so as to
17  arrive at the settlement of some matter."[2]  Maita cannot constrict "negotiate" to "an offer [by the
18  successor distributor]," or rewrite the statute from a mutual obligation to confer into a unilateral
19  obligation of the successor distributor to make an offer.  In construing a statute the court shall
20  neither omit words nor insert words that are not there. *See Yucaipa Water Co. No. 1 v. Public
21  Utilities Comm'n*, 54 Cal. 2d 823, 831 (1960); *see also Doe v. City of Los Angeles*, 42 Cal. 4th
22  531, 545 (2007) ("in construing . . . any statute, we may not broaden or narrow the scope of the
23  provision by reading into it language that does not appear in it or reading out of it language that
24  does").

---

[1]  11/03/09 Order Denying in part and Granting in part the parties' Cross-Motions for
Summary Adjudication ("Order on Summary Adjudication"), 13:15-17.

[2]  Merriam-Webster's Online Dictionary, available at http://www.merriam-
webster.com/dictionary/negotiate (last accessed November 13, 2009).

1    Second, "good faith," undefined in the statute, is elsewhere defined as honesty in fact and

2    fair dealing.[3]  Maita bases its assertion of lack of faith solely on the failure to receive an offer

3    within thirty days of receiving the termination notice of September 2.  The undisputed facts show

4    first that DBI sent an offer on October 15 and then, on October 21, minutes after being informed

5    that the offer had not been received, re-sent its offer.  There is no claim that Maita was

6    disadvantaged or that DBI was advantaged in that miscommunication, if any, nor is there a claim

7    of any lack of honesty on DBI's part.  Again, the statute cannot be rewritten.  *Doe v. City of Los*

8    *Angeles*, 42 Cal. 4th 531, 545 (2007).

9    Third, and finally, is what *did* happen.  Maita was notified September 2, 2008 of

10   MillerCoors' intent to terminate it, and received written formal notice September 8, 2008.

11   Meanwhile, Maita, with its brokers, decided to withhold from DBI basic financial documents such

12   as financial statements.  The first information Maita's brokers provided DBI was a Confidential

13   Offering Memorandum ("COM"),[4] dated September 28, 2008, asserting impossibly rosy

14   predictions of how DBI would profit after acquiring the Maita operation.  The COM, described by

15   its author as a marketing document constructed on "back of the envelope" figures, was most

16   notable for what it did not include: an asking price, gross profit figures per supplier, and basic

17   numbers like rent, salary and overall gross profit.  DBI swiftly and diligently asked for those

18   building blocks so it could conduct a reasonable estimate of what the business was worth.  And

19   when those finally arrived, DBI immediately reiterated its offer.

20   Maita denigrated the offer and made no counter.  DBI bid again, after the parties talked and

21   met in November, and through December, when Maita broke off discussions.  The parties were

22   apart on price because Maita thought DBI would realize consolidation savings, or synergies, that

23   DBI thought impossibly optimistic (and Maita's actual experience in acquiring Coors in 2002

24   belied that as well, and led Maita to conceal from DBI how Maita was actually performing).  That

25   is a disagreement, not lack of good faith.  While Maita was responsive to a potential purchase in

---

3    See Cal. Comm. Code § 1201(b)(20) (defining "good faith" as "honesty in fact and the
     observance of reasonable commercial standards of fair dealing").

4    See Maita's Confidential Offering Memorandum to DBI, DBI's Trial Exhibit ("Ex.") 118.

-2-

1    its concurrent negotiation with an in-county distributor, Matagrano, in DBI's case, Maita chose to

2    stonewall.

3        Negotiate is what DBI did, in good faith, but with little help from Maita. The statute by

4    design allows for a demand/offer gulf so great it can only be settled by arbitration, and DBI is

5    entitled to a judgment in its favor and to proceed to the arbitration step in this statutory process.

6                            **II. STATEMENT OF FACTS**

7    **A.    July 2008 - September 8, 2008: MillerCoors Terminates Maita and DBI Begins Good**

8           **Faith Negotiations**

9        As a successor manufacturer under section 25000.2, MillerCoors LLC ("MillerCoors")

10   designated DBI its successor wholesaler. MillerCoors then properly provided Maita written notice

11   of its intent to terminate Maita as the distributor of its products in San Mateo County. *See* Cal.

12   Bus. & Prof. Code § 25000.2. Pursuant to section 25000.2(d), Maita and DBI then embarked on

13   negotiations to establish the fair market value of the affected distribution rights, but the focus on

14   both sides was to find a price for the entire distributorship.

15       DBI first hired a reputable broker, Joe Thompson of Independent Beverage Group

16   ("IBG"), to negotiate the transfer. IBG sent Maita its standard Request for Information, asking for

17   necessary financial information to value the distribution rights, on August 27, 2008. It requested:

18   (1) Maita's previous three year's financial statements; (2) its gross profit and sales volume figures

19   per supplier; (3) its discretionary expenses; and (4) its employee salary and expense information.

20   Ex. 113.

21       Maita also hired a broker, Ippolito Christon & Co. ("Ippolito"). On September 2, 2008,

22   Ippolito sent a Preliminary Information Request to its own client similar in key measures to IBG's

23   request. Ippolito requested, among other things: (1) Maita's reviewed financial statements for the

24   past two years; (2) Maita's gross profit and sales volume figures by supplier; (3) Maita's

25   discretionary and operating expenses; and (4) capital expenditures. The next day, on September 3,

26   2008, Maita faxed Ippolito all of this information. Ex. 116. Maita provided nothing to DBI.

27

28

1  **B.**    **September 28, 2008 – October 6, 2008: Instead of Answering DBI's Request for**
2         **Information, Maita Responds With a Confidential Offering Memorandum and**
3         **Limited, Non-Detailed Financial Data**

4         Maita intentionally did not respond to the information request IBG sent.  Maita's actual
5  financial performance was disappointing following its own acquisition of Coors and other rights in
6  2002, and that continued to hamper its performance.  Instead, on September 28, 2008, after the
7  parties negotiated and executed a Non-Disclosure Agreement, Maita's broker provided DBI with a
8  COM.  Ex. 118.  The COM made it clear Maita sought to sell its entire business to DBI, not just its
9  MillerCoors distribution rights.  Marcus Maita acknowledged as much, telling DBI that it must
10 make an offer for Maita "in its entirety" and observing any attempt by DBI to distribute Miller and
11 Coors alone in San Mateo would be a "disgusting disaster."  Ex. 117.  The COM also revealed that
12 Maita sought a purchase price based on synergies that it insisted that DBI, as a neighboring (vs.
13 "in-market") wholesaler, would realize from the acquisition.  Yet, the COM set forth surprisingly
14 little details about these alleged synergies, instead providing only sales volume, gross profit, and
15 EBITDA figures for Maita's Crown distribution rights, and then massing together this same
16 information for all of Maita's "Other" distribution rights.

17         On October 6, 2008, knowing she owed DBI financial information and concerned that "I
18 don't think we can avoid providing this information now," Maita's broker sent DBI a non-detailed
19 2007 Income Statement and 2008 projection, along with a 2007 Balance Sheet.  Ex. 120.  Upon
20 receipt of the Income Statement, DBI first learned that Maita's projected EBITDA for 2008 was
21 ████████████  Maita's broker had Maita's financial statement for over a month, and counseled
22 withholding it, stating "I do not think we need (or want) to send reviewed financials at this time.
23 Marcus has indicated that there is information contained therein that he does not want DBI to see
24 yet."  Ex. 119.  She also acknowledged Maita's ████████████ operating profit, and voiced
25 her fear that DBI would submit an offer based on Maita's actual financial performance, rather than
26 the synergies casually predicted by the COM.  *Id.*

27
28

-4-

1    **C.      October 8, 2008 to October 14, 2008: DBI Seeks the Financial Information Initially**
2    **Requested, and Receives Some**

3           After receiving Maita's COM and its non-detailed Income Statements and Balance Sheet,
4    DBI's broker sent a serious of e-mail requests to Maita for information that it had previously
5    requested in August 27. Exs. 121-125, 128. As of October 8, 2008—30 days after Maita received
6    MillerCoors' Termination Notice and more than 40 days after IBG sent its Request for
7    Information—DBI had yet to even receive Maita's gross profit or sales volume figures for Miller
8    and Coors. Maita first provided those figures October 9, 2008. Ex. 121.

9           On October 9, 2008, IBG also sent two e-mails to Maita requesting that it provide line-item
10   financials, payroll information, an organizational chart, owner salaries/benefits, and a list of all
11   one-time or discretionary expenses that Maita included in its income statement. Exs. 122-124.
12   Maita responded with an organizational chart and salary information by position, and it informed
13   DBI that it would work on gathering the other information requested. Yet Maita had already
14   provided all of this to its own broker.

15          On October 10, 2008, DBI wrote to Maita's broker to confirm Maita's adjusted EBITDA
16   based on synergies and to inquire whether Maita would be making an offer or whether it wanted
17   DBI to do so. Ex. 125. On October 13, 2008, DBI informed Maita that it should have an offer
18   shortly. Ex. 126. The next day, on October 14, 2008, DBI repeated its request for a detailed, line-
19   item financial statement and details regarding non-recurring discretionary expenses and owner
20   compensation. Ex. 128. It informed Maita that with this information, it could very quickly
21   provide an offer. Maita's broker responded only that DBI must make sure to break its offer out by
22   dollar amount per each brand Maita distributed so that Maita could compare DBI's offer to other
23   offers. Ex. 127.

24   **D.      October 15, 2008 – December 15, 2008: After Receiving the Financial Information**
25   **Maita Would Provide, DBI Quickly Submits an Offer and Continues to Negotiate**

26          On October 15, 2008, after receiving what information Maita's broker would provide,
27   DBI's broker sent an e-mail offer to purchase Maita's entire business. Ex. 129. On October 17,
28   2008, having not heard any response from Maita, DBI initiated arbitration 39 days after Maita's

W02-WEST:5MON1\402285677.1\                              DEFENDANT DBI'S REVISED TRIAL BRIEF

1  receipt of MillerCoors' termination notice. Ex. 131. Next, in the morning on October 21, 2008,

2  still not having heard from Maita, DBI phoned Maita to inquire where it stood on the October 15th

3  offer. Ex. 130. Maita informed DBI that it had not received any offer. Upon learning this, at 8:32

4  a.m. on October 21, 2008, IBG resent the offer to Maita. Ex. 132.

5        After confirming receipt of DBI's offer, from October 23rd to October 30th, Maita's broker

6  wrote to DBI insisting that it break down its offer to a dollar amount for each brand Maita

7  distributed. Ex. 134. DBI did so for MillerCoors brands, but informed Maita that it intended to

8  make an offer for the remainder as a multiple of EBITDA. DBI acknowledged the possibility of

9  synergies, but reminded Maita that, despite multiple requests, Maita had not provided it with the

10  information necessary to assess these claimed synergies. DBI also expressed a willingness to

11  further discuss should Maita be willing to provide the information requested. In response, Maita

12  wrote that DBI's unwillingness to break down prices in dollar terms for each non-MillerCoors

13  brand in Maita's portfolio constituted bad faith and that DBI's         offer for

14  MillerCoors was a "low-ball price." Ex. 135. But Maita provided no counter-offer.

15  **E.**       **December 15, 2008: Having Never Provided Any Demand or Counter, Maita Refuses**

16           **All of DBI's Offers and Ends Discussions**

17        After receipt of Maita's October 31st letter, DBI reiterated its offer to purchase Maita's

18  MillerCoors rights and the rest of its business. Ex. 136. On November 3, 2008, it also requested a

19  counteroffer from Maita. *Id.* Although Maita never provided one, the parties continued

20  negotiations from November to mid-December. Exs. 138-142. But the theme remained

21  consistent. Not once during the 30 days or at any time thereafter did Maita provide DBI with *any*

22  counteroffer or *any* asking price for the distribution rights. When DBI made a final offer to

23  purchase on December 15, 2008 for       Maita again rejected it and again refused to

24  counter. Ex. 142. Maita then ended discussions.

25                              **III. ARGUMENT**

26  **A.**       **Maita Cannot Bear Its Burden of Establishing that DBI Failed to Negotiate in Good**

27           **Faith or that this Alleged Failure Prevents Arbitration**

28

-6-

1   Despite Maita's stonewalling and DBI's good faith efforts, Maita now asks this Court to

2   rule that DBI failed to negotiate in good faith. Maita, as plaintiff, bears the burden of persuasion.

3   *See* Cal. Evid. Code § 500; *Weiner v. Fleischman*, 54 Cal.3d 476, 483 (1991) (citation omitted)

4   *see also* CACI 200.[5]  Maita cannot do so.

5          **1.      Maita Cannot Rewrite the Statute To Require One Party Make an Offer**

6   Maita cannot reduce the definition of "negotiate" to "make an offer."[6]  "The court must

7   avoid reading into the statute words that are not there. The court cannot 'insert what has been

8   omitted, or omit what has been inserted.'" Order on Summary Adjudication, 5:27-28: 6:1-2

9   (citing *Yucaipa Water Co. No. 1*, 54 Cal.2d at 831 and *Doe*, 42 Cal.4th at 545 (internal quotation

10  omitted)). Nothing in the statute requires a formal offer. Had the Legislature intended to impose a

11  unilateral obligation on the successor distributor to make an offer, the statute would say so. It

12  does not.

13  Not only does section 25000.2 not require a formal offer, "good faith" negotiation is not

14  defined as a formal offer by analogous law or by plain and common sense meaning. Rather,

15  California law defines "good faith" as "honesty in fact and the observance of reasonable

16  commercial standards of fair dealing."[7]  *See* Cal. Com. Code § 1201(b)(20); *California v. Chevron*

17  _____

[5]      In diversity cases, state law governs the burden of proof. *Cal. Sansome Co. v. United States Gypsum*, 55 F.3d 1402, 1406 (9th Cir. 1995).

18

19  [6]      Maita's suggestion that the Court must only consider negotiations during the first 30-days after Maita received its termination letter from MillerCoors is not persuasive. To properly

20      determine DBI's intent with regard to these negotiations, the Court should consider the entire negotiation period because, "'the determination of intent [relating to good faith]

21      must be founded upon the party's overall conduct and the totality of the circumstances.'" *William Dal Porto & Sons Agric. Labor Relations Bd.*, 163 Cal. App. 3d 541, 549 (1984)

22      (citation omitted). All the relevant communications bear on intent. *See* Fed. R. Evid. 401.

23

24  [7]      Furthermore, California law makes clear that "good faith is a subjective standard of actual knowledge." *Bank One, Dearborn, N.A. v. Maisel*, No. C 02-0531 MHP, 2004 U.S. Dist.

25      LEXIS 2406, *14 (N.D. Cal. Feb. 17, 2004); *see also Farmers & Merchants State Bank v. Western Bank*, 841 F.2d 1433, 1444 (9th Cir. 1987) (the appropriate standard for "good

26      faith" defined as "'honesty in fact in the conduct or transaction concerned'" is "'a subjective one, looking to the intent or state of mind of the party concerned'") (citation

27      omitted). Whereas, bad faith is "a concept with a well-settled meaning in the law," defined as "'neglect or refusal to fulfill some duty or some contractual obligation, **not prompted**

28

1  *Corp.*, 872 F.2d 1410, 1413 (9th Cir. 1989); *E.S. Bills v. Tzucanow*, 38 Cal.3d 824, 833 (1985);

2  *see also* Cal. Civ. Code § 1102.7 (defining "good faith" as "honesty in fact in the conduct of the

3  transaction"); *Calemine v. Samuelson*, 171 Cal. App. 4th 153, 162 (2009) (same). The Kentucky

4  beer distribution transfer statute after which section 25000.2 was modeled similarly defines "good

5  faith". *See* Ky. Rev. Stat. Ann. §§ 244.604(4); 244.606(2)(d).

6        And "negotiate" commonly means "to confer with another so as to arrive at the settlement

7  of some matter." Merriam-Webster's Online Dictionary, available at http://www.merriam-

8  webster.com/dictionary/negotiate (last accessed Nov. 13, 2009). It also means "'. . . to conduct

9  communications or conferences with a view to reaching a settlement or agreement. It is that

10 which passes between parties or their agents in the course of or incident to the making of a

11 contract and is also conversation in arranging terms of contract . . . .'" *Markborough Cal. Inc. v.*

12 *Superior Court*, 227 Cal. App. 3d 705, 714 (1991) (citing Black's Law Dict. (5 th ed. 1979) p.

13 934)). "The word *'negotiate' has no precise definition and means nothing more than the*

14 *process by which parties come to or do not come to an agreement* . . . . Obviously, what

15 constitutes 'negotiation' in any one case cannot be fixed with any degree of specificity . . . ." *Id.*

16 (emphasis added).

17       No interpretative alchemy turns "negotiate" into "I need not say or do anything, but you

18 must make an offer."[8]  Therefore, Maita cannot establish its claim.

19

20

21

22      **by an honest mistake as to one's rights or duties, but by some interested or sinister**

23      **motive.'"** *United States v. Louisiana-Pacific Corp.*, 967 F.2d 1372, 1380 (9th Cir. 1992)
        (citing Black's Law Dictionary) (emphasis added). Accordingly, the proper consideration

24      is DBI's subjective knowledge concerning its negotiation efforts.
   [8]  This argument is similar to, but no better than, Maita's unsuccessful claim that a

25      "successor beer manufacturer's designee" under the statute must be restricted to a licensed
        distributor. *See* Order on Summary Adjudication at 11:13-28, fn. 4. Just as the Court held

26      that the statute's provisions "do not define 'distributor' as one who is licensed to distribute
        beer in the State," so here neither does the statute define "negotiate" as requiring the

27      successor beer manufacturer's designee to provide an offer in the first 30-days after the
        existing distributor is terminated.

28

1    **2.    Maita Cannot Establish Its Case Because DBI Engaged in Honesty in Fact and**
2        **Fair Dealing**

3    Moreover, DBI's conduct satisfies the legal definition of "good faith" and the common
4    sense definition of "negotiate." These require an honest back and forth in an attempt to reach a
5    settlement, and this is precisely what occurred, at least on DBI's part.

6    DBI hired a reputable broker to negotiate the purchase of Maita's distribution rights, who
7    promptly sent a standard commercially reasonable request for financial information to Maita.
8    Maita too hired a broker, and that broker asked for much the same information from its client,
9    Maita, as had DBI's broker.  The difference is Maita answered its broker's request the day after it
10   was sent, yet chose to withhold this financial information from DBI.

11   So, when Maita sought an offer for its entire business based on speculative synergies
12   claimed by the COM and later revealed its actual EBITDA, DBI pursued the pertinent information
13   needed to value the distribution rights and assess Maita's actual performance.  Then, after DBI had
14   received all of the information Maita was willing to provide, DBI promptly made an offer before
15   initiating arbitration on October 17, 2008.  And, minutes after it was informed that its offer had
16   not reached Maita, DBI re-conveyed it.  DBI then continued negotiations beyond the 30 day
17   period, evidencing its continued good faith intent and desire to reach an agreement.  In the face of
18   Maita's failure to make any demand or to specify any purchase price, DBI set forth and reiterated
19   multiple, increasing offers.  These facts are not in dispute.

20   There is also a deafening silence undercutting Maita's bad faith claim.  Rather incredibly,
21   Maita's principal broker, Andrew S. Christon, was unable to recall *any* details of Maita and DBI's
22   negotiations during his deposition.  *See* Declaration of Mark Slater, filed with DBI's Initial Trial
23   Brief on 11/06/09 ("Slater Decl. in Support of Initial Trial Brief") at Ex. A (referencing excerpts
24   from the Christon deposition) at 8:1-3 (Q: When Mr. Maita [initially] called you, what was he
25   asking you to do for him? A. I – I don't specifically recall); 24:16-19 (Q. . . was there a reason that
26   particular methodology as opposed to any other was chosen? A. I don't recall.); 34:20-22 (Q. And
27   at this point in time, had you talked directly with anyone from DBI? A. I don't recall); 135:1-4 (Q.
28   At this point in time, October 31, 2008, had anyone from the Ippolito side given anyone on the

1  DBI side any sort of a counteroffer? A. I don't recall); 159:5-15 (Q. At that point in time,

2  December 10, 2008, did you have a number in mind that reflected fair market value? A. I – I don't

3  recall. Q. Okay. Do you recall conveying anything to Mr. Maita about your views, if you had any,

4  on what fair market value would be? A. I don't recall); 162:6-11 (discussing DBI's offer to Maita

5  of ████████ Q. Did you have any reaction to this offer? A. I don't recall. A. Did anyone ever

6  convey their opinion, that offer to you? A. No, I – I mean, I don't recall any opinion being

7  expressed).[9] Maita's broker appears to have a complete memory failure. Maita cannot establish

8  lack of good faith.

9      **3.    Maita Cannot Prove "Good Faith" Imposes Differing Obligations on the**

10           **Parties**

11         Maita's inability to establish lack of good faith is highlighted by several other factors,

12  including its own admissions and its decision to conceal relevant financial documents from DBI.

13  Maita may attempt to prove that good faith means something more or different for DBI than it

14  does for Maita.  Although Maita admits that it made no counteroffer or demand to DBI

15  whatsoever, and it insists it negotiated in good faith.  When asked to describe all facts showing

16  that Maita negotiated in good faith, Maita in responded in conclusory fashion that it "provided

17  sufficient information to DBI to allow DBI to make a good faith offer to purchase Plaintiff's

18  MillerCoors rights."  *See* Maita's Responses to DBI's First Set of Interrogatories, attached as

19  Exhibit A to the Supplemental Declaration of Mark K. Slater in Support of DBI's Motion for

20  Summary Judgment.

21

22

23  [9]    *See also* Slater Decl. in support of Initial Trial Brief, Ex. A at 7:13-17; 13:22-14:1; 30:14-
       31:1; 33:20-22; 41:2-7; 44:11-16; 49:25-50:1; 52:10-12; 53:5-7; 58:9-12; 60:14-61:2;
24     63:19-64:9; 65:1-4; 69:14-70:1; 70:19-71:10; 74:21-75:4; 82:22-83:17; 84:17-20; 85:4-16;
       86:1-19; 90:16-18; 92:10-16; 93:2-5; 93:25-94:3; 95:10-11; 95:25-96:2; 96:22-97:4; 98:10-
25     24; 99:18-20; 100:9-20; 102:5-11; 103:18-20; 103:25-104:2; 104:8-10; 105:22-106:8;
       109:18-20; 110:25-111:24; 113:8-20; 115:5-9; 117:5-14; 119:25-120:8; 121:4-13; 123:8-
26     10; 123:25-124:15; 125:21-126:2; 128:6-7; 128:25-129:2; 129:18-22; 130:9-21; 135:20-
       136:18; 137:19-22; 138:12-14; 139:9-11; 140:4-5; 140:24-141:7; 143:18-20; 143:11-
27     144:25; 147:25-148:1; 148:19-149:5; 151:17-21; 152:2-8; 153:11-15; 160:13-16; 162:1-
       163:2; 164:7-10; 165:10-17.

28

DEFENDANT DBI'S REVISED TRIAL BRIEF

1  Even that is not true. Maita (not DBI) consciously concealed vital financial documents

2  during negotiations, which prolonged the process and possibly mislead DBI. Maita promptly

3  provided to its own broker the same information that it deliberately withheld from DBI. Maita's

4  broker memorialized this in writing, "As you both know, we need to provide financial and

5  warehouse information to DBI . . . I do not think we need (or want) to send the reviewed financials

6  at this time . . Marcus has indicated that there is information contained therein that he does not

7  want DBI to see yet." Ex. 119. ███████████████████████████████

8  ████████████████████████████████████████████████████████

9  ████████████████████████████████████████████████████  *Id.*

10  Maita did not even provide DBI with MillerCoors' gross profit figures until after the 30-day

11  negotiation period passed. DBI negotiated in good faith. Maita took an aggressive stance to

12  withhold information and try to change the conversation from what Maita actually was doing to

13  what DBI might do with the same brands. Maita provoked a delay and cannot now complain

14  about the result of its own deliberate acts.

15  In the end, the parties simply could not agree on future savings, and thus not on a price.

16  The statute contemplates the possibility of just this result, and provides for arbitration to resolve

17  the impasse. Maita cannot establish by any evidence, much less a preponderance of the evidence,

18  lack of good faith negotiation by DBI.

19  **B.  There Is No Implied Condition Precedent in Section 25000.2(d)**

20  Maita urges this Court to insert a condition precedent into section 25000.2 that is not there.

21  Subsection (d) sets forth a 30-day period for the parties to negotiate the sale of the affected

22  distribution rights in good faith, which DBI did. Cal. Bus. & Prof. Code § 25000.2(d). But,

23  subsection (f), which prescribes mandatory arbitration, plainly does not state either that failure to

24  negotiate in good faith precludes arbitration or that it is a condition precedent thereto.

25  Rather, subsection (f) provides:

26  *If the successor beer manufacturer's designee and the existing*
*beer wholesaler are unable to mutually agree on the fair market*

27  *value of the affected distribution rights within 30 days of the*
*existing beer wholesaler's receipt of the successor beer*

28  *manufacturer's notice pursuant to subdivision (c), the successor*

-11-

1        *beer manufacturer's designee or the existing beer wholesaler shall*
       *initiate arbitration against each other to determine the issue of*
2        *compensation for the fair market value of the affected distribution*
       *rights . . . .*

3

4 Cal. Bus. & Prof. Code §25000.2(f) (emphasis added).

5        The only condition precedent to arbitration is that the parties be unable to mutually agree

6 on the fair market value of the affected distribution rights. *Id.* If so, the parties are to initiate and

7 proceed with mandatory arbitration. *Id.* This is consistent with the legislative purpose of

8 providing an expedited arbitration to determine fair market value. Any contrary conclusion would

9 promote litigation each time arbitration under section 25000.2 is sought. Such interpretation is

10 both unsupported by the express provisions of the statute and defies its intent. *See Dyna-Med, Inc.*

11 *v. Fair Employment & Housing Com.*, 43 Cal.3d 1379, 1392 (1987) (statutes are to be interpreted

12 consistent with legislative intent and to prevent absurdity). Here, the parties could not agree on

13 the value of the affected distribution rights. DBI initiated arbitration. Under section 25000.2(f),

14 the arbitration proceeds.

15        Moreover, if, as Maita urges, good faith negotiation is to be construed as a condition

16 precedent, it must apply equally to both parties. Maita consciously concealed financial

17 information from DBI, did not provide basic information such as MillerCoors gross profit figures

18 until after the 30-day period passed, and steadfastly refused to make a single offer or counteroffer.

19 DBI amply proves its good faith, but if good faith negotiation is a condition precedent to

20 arbitration, then Maita fell far short. By its own logic, Maita has forfeited the right to participate

21 in the arbitration.

22        ///

23        ///

24        ///

25

26

27

28

## IV. CONCLUSION

Maita cannot prove that "good faith negotiation" is a condition precedent to arbitration, that Maita satisfied the standard for "good faith negotiations" that it seeks to write into the statute and apply unilaterally to DBI, or that DBI failed to negotiate in good faith. DBI respectfully requests the Court enter judgment in its favor.

DATED: November 13, 2009         SHEPPARD, MULLIN, RICHTER & HAMPTON LLP


                    By      _____
                                    /s/ Mark K. Slater
                                  MARK K. SLATER
                                 Attorneys for Defendant
                                 DBI BEVERAGE INC.

SHEPPARD, MULLIN, RICHTER & HAMPTON LLP
    A Limited Liability Partnership
    Including Professional Corporations
MARK K. SLATER, Cal. Bar No. 129742
JONATHAN P. HERSEY, Cal. Bar No. 189240
ELISE K. SARA, Cal. Bar No. 253813
MOLLY R. NEWLAND, Cal. Bar No. 244928
4 Embarcadero, 17th Floor
San Francisco, California 94111-4109
Telephone:    415-434-9100
Facsimile:    415-434-3947
mslater@sheppardmullin.com
jhersey@sheppardmullin.com
esara@sheppardmullin.com
mnewland@sheppardmullin.com

Attorneys for Defendant
DBI BEVERAGE INC.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA, SAN JOSE DIVISION

| | |
|---|---|
| MAITA DISTRIBUTORS, INC. OF SAN MATEO COUNTY, a California corporation,<br><br>                              Plaintiff,<br><br>        v.<br><br>DBI BEVERAGE INC., a Tennessee corporation,<br><br>                              Defendant. | Case No.: 5:09-CV-2318 RMW (HRL)<br><br>PROOF OF SERVICE |

1

PROOF OF SERVICE

2

UNITED STATES DISTRICT COURT

3

<u>NORTHERN DISTRICT OF CALIFORNIA – SAN JOSE DIVISION</u>

4

I am employed in the County of San Francisco; I am over the age of eighteen

5

years and not a party to the within entitled action; my business address is Four
Embarcadero Center, 17th Floor, San Francisco, California 94111-4109.

6

On **November 13, 2009**, I served the following document(s) described as:

7

**DOCUMENTS SUBMITTED UNDER SEAL**

8

**1) DBI BEVERAGE INC.'S UNREDACTED REVISED TRIAL BRIEF; AND**

9

**2) DBI BEVERAGE INC.'S UNREDACTED PROPOSED FINDINGS OF
FACT AND CONCLUSIONS OF LAW**

10

11

on the interested party(ies) in this action by placing true copies thereof enclosed in sealed
envelopes and/or packages addressed as follows:

12

Craig S. Ritchey, Esq.,                         Jesse F. Ruiz, Esq.
John G. Hursh, Esq., and/or               Robinson & Wood, Inc.

13

Patricia A. Welch                                227 North First Street, Suite 300
Dorsey & Whitney LLP                      San Jose, CA  95113

14

1717 Embarcadero Road
Palo Alto, CA  94303

15

*Attorneys for Intervenor
Miller Coors, LLC*

16

*Attorneys for Defendant  Maita
Distributors Inc. of San Mateo County*

17

Michael W. Youtt, *Pro Hac Vice*

18

Russell D. Workman, *Pro Hac Vice*
Alissa B. Rubin, *Pro Hac Vice*

19

King & Spalding LLP
Houston, TX  77002

20

*Attorneys for Intervenor
Miller Coors, LLC*

21

22

☐     **BY MAIL:** I am "readily familiar" with the firm's practice of collection and

23

processing correspondence for mailing.  Under that practice it would be deposited
with the U.S. postal service on that same day with postage thereon fully prepaid at

24

San Francisco, California in the ordinary course of business.  I am aware that on
motion of the party served, service is presumed invalid if postal cancellation date or

25

postage meter date is more than one day after date of deposit for mailing in
affidavit.

26

☒     **BY OVERNIGHT DELIVERY:** I served such envelope or package to be

27

delivered on the same day to an authorized courier or driver authorized by the
overnight service carrier to receive documents, in an envelope or package

28

designated by the overnight service carrier.

1  ☐   **BY FACSIMILE:** I served said document(s) to be transmitted by facsimile
2      pursuant to Rule 2.306 of the California Rules of Court. The telephone number of
       the sending facsimile machine was 415-434-3947. The name(s) and facsimile
       machine telephone number(s) of the person(s) served are set forth in the service list.
3      The sending facsimile machine (or the machine used to forward the facsimile)
       issued a transmission report confirming that the transmission was complete and
4      without error. Pursuant to Rule 2.306(g)(4), a copy of that report is attached to this
       declaration.
5
6  ☐   **BY HAND DELIVERY:** I caused such envelope(s) to be delivered by hand to the
       office of the addressee(s).
7  ☐   **STATE:** I declare under penalty of perjury under the laws of the State of
8      California that the foregoing is true and correct.
9
10 ☒   **FEDERAL:** I declare that I am employed in the office of a member of the bar of
       this Court at whose direction the service was made. I declare under penalty of
11     perjury under the laws of the United States of America that the foregoing is true and
       correct.
12     Executed on **November 13, 2009**, at San Francisco, California.
13
14
15     _____
       Allen E. Rose
16
17
18
19
20
21
22
23
24
25
26
27
28

EXHIBIT 2

1  SHEPPARD, MULLIN, RICHTER & HAMPTON LLP
     A Limited Liability Partnership
2      Including Professional Corporations
   MARK K. SLATER, Cal. Bar No. 129742
3  JONATHAN P. HERSEY, Cal. Bar No. 189240
   ELISE K. SARA, Cal. Bar No. 253813
4  MOLLY R. NEWLAND, Cal. Bar No. 244928
   4 Embarcadero, 17th Floor
5  San Francisco, California 94111-4109
   Telephone:    415-434-9100
6  Facsimile:    415-434-3947
   mslater@sheppardmullin.com
7  jhersey@sheppardmullin.com
   esara@sheppardmullin.com
8  mnewland@sheppardmullin.com

9  Attorneys for Defendant
   DBI BEVERAGE INC.
10

11                  UNITED STATES DISTRICT COURT

12        NORTHERN DISTRICT OF CALIFORNIA, SAN JOSE DIVISION

13

14  MAITA DISTRIBUTORS, INC. OF SAN        Case No.: 5:09-CV-2318 RMW (HRL)
    MATEO COUNTY, a California
15  corporation,                           **DBI BEVERAGE INC.'S REVISED**
                                           **[PROPOSED] FINDINGS OF FACT**
16                    Plaintiff,           **AND CONCLUSIONS OF LAW**

17        v.                               **UNREDACTED VERSION**

18  DBI BEVERAGE INC., a Tennessee         Hearing date: November 17, 2009
    corporation,                           Time:         9:00 a.m.
19                                         Dept.:        Courtroom 6, 4th Floor
                      Defendant.
20                                         Complaint Filed (in State Court):  May 6,
                                           2009
21
                                           Removed:  May 26, 2009
22

23

24

25

26

27

28
                                        -1-
   W02-WEST:5ELS1\402271407.2            REVISED [PROPOSED] FINDINGS OF FACT AND
                                                      CONCLUSIONS OF LAW

1    Pursuant to the Court's order at the November 6, 2009 pretrial conference in the

2    above-entitled matter, DBI Beverage Inc. ("DBI") submits the following amended

3    proposed findings of fact and conclusions of law.

### I. FINDINGS OF FACT

5    **A.    The Relevant Contracts**

6        1.    Effective January 1, 1999, Maita Distributors, Inc. ("Maita") entered into its

7    current distribution agreement with Miller Brewing Company.

8        2.    Maita acquired the right to distribute Coors Brewing Company products in

9    San Mateo County in 2002.

10   **B.    MillerCoors LLC Becomes a Successor Manufacturer and Terminates Maita.**

11       3.    MillerCoors LLC began operation on July 1, 2008, as a new Delaware

12   limited liability company.

13       4.    MillerCoors is a new entity, separate and distinct from its members—Miller

14   Brewing Company and Coors Brewing Company.

15       5.    On July 1, 2008, MillerCoors became a "successor beer manufacturer" as

16   defined in California Business and Professions Code section 25000.2 ("section 25000.2").

17       6.    In August 2008, MillerCoors informed Maita that it intended to terminate

18   Maita's Miller and Coors distribution rights and to give those rights to another distributor.

19       7.    On September 8, 2008, Maita received MillerCoors' Termination Notice,

20   dated September 2, 2008.

21       8.    In its Termination Notice, MillerCoors states: (i) it has acquired the Miller

22   and Coors brands distributed by Maita; (ii) it intends to terminate Maita's Miller and Coors

23   distributor agreements; and (iii) it has designated DBI Beverage, Inc. ("DBI") as the new

24   distributor for the Miller and Coors brands in Maita's territory.

25   **C.    DBI Negotiates in Good Faith with Maita, and Maita Negotiates with Another**

26        **Wholesaler**

27

28

-2-

9.    DBI engaged reputable national beer distributor broker, Joe Thompson from Independent Beverage Group, to negotiate the purchase of Maita's MillerCoors distribution rights.

10.    DBI sent Maita a Request for Information, asking for detailed financial information regarding Maita's business on August 27, 2008, including Maita's previous three years financial statements, its gross profit and sales volume figures per supplier, its discretionary expenses, and employee salary and expense information.

11.    Maita engaged Andrew S. Christon and Ippolito Christon & Co. ("Ippolito") to negotiate the sale of its business.

12.    On September 2, 2008, Ippolito sent Maita a Preliminary Information Request, including a request for: Maita's reviewed financial statements for the past two years; gross profit and sales volume figures by supplier; discretionary and operating expenses; and capital expenditures.

13.    On September 3, 2008, Maita sent Ippolito the information Ippolito requested.

14.    On September 28, 2008, more than a month after DBI sent its Request for Information and following the execution of a confidentiality agreement, Maita sent DBI a Confidential Offering Memorandum ("COM") rather than the financial data DBI requested.

15.    Maita sought a purchase offer for its entire business.

16.    The COM revealed that Maita sought an undisclosed purchase price that imputed contemplated savings or "synergies" that DBI would allegedly gain from the purchase of Maita's business.

17.    On October 6, 2008, Maita's broker authored an e-mail conveying Maita's desire to hide certain financial information from DBI. This e-mail states, "I do not think we need (or want) to send reviewed financials at this time. Marcus has indicated that there is information contained therein that he does not want DBI to see yet."

REVISED [PROPOSED] FINDINGS OF FACT AND
CONCLUSIONS OF LAW

1     18.    On October 6, 2008, Maita's broker sent DBI some of the financial

2 information that DBI requested. Specifically, Maita's broker sent an income statement for

3 2007 and 2008 and a 2007 balance sheet. She also provided a brief description of its

4 warehouse space.

5     19.    On October 6, 2008, Maita did not provide reviewed financials or gross

6 profit and sales volume figures by supplier to DBI, but it informed DBI that it had

7 provided the "relevant historical and current year financial date for Maita."

8     20.    As of October 8, 2008, 30 days after Maita received its Notice of

9 Termination, Maita had not provided DBI with its gross profit figures for MillerCoors

10 products.

11     21.    On October 8, 2008, DBI requested Maita confirm that its 2008 income

12 statement figures were a projection since the document sent to DBI did not clarify this. It

13 also requested that Maita provide it with information regarding sales by volume by specific

14 brand and MillerCoors gross profit figures as this information had previously combined

15 with other brands' gross profit figures in the COM.

16     22.    On October 9, 2008, Maita's broker provided DBI with sales volume figures

17 and gross profit figures broken down by each brand that Maita distributed.

18     23.    On October 9, 2008, DBI requested that Maita provide line item financials,

19 payroll information, and an organizational chart. DBI also requested that Maita provide it

20 with owner salaries/benefits and all one-time or discretionary expenses that Maita had

21 included in its income statement.

22     24.    Maita's broker responded to DBI's request in the evening on October 9, 2008.

23 It provided an organizational chart that listed salaries by position, and informed DBI that it

24 was working on gathering the other information requested.

25     25.    In the afternoon of Friday, October 10, 2008, DBI wrote to Maita's broker to

26 confirm Maita's calculation of its adjusted EBITDA figure and to inquire whether Maita

27 would be making an offer or whether it wanted DBI to do so.

28

-4-

1      26.    On Monday, October 13, 2008, DBI's broker wrote to Maita's broker to

2 inform them that it hoped to have them an offer the next day.

3      27.    On Tuesday, October 14, 2008, Maita's broker wrote to DBI, insisting that

4 DBI break down its offer on all brands sold my Maita so that Maita could compare DBI's

5 offer with other offers it had received.

6      28.    On Tuesday October 14, 2008, DBI repeated its request for a line item

7 financial statement and for Maita's non-recurring, discretionary expenses.  DBI informed

8 Maita that it could have an offer to it very quickly upon receipt of this information.

9      29.    On Wednesday, October 15, 2008, DBI sent an offer to purchase Maita's

10 business for ████████████

11      30.    On October 15, 2008, Maita's broker sent ████████████████ a

12 letter discussing the sale of Maita's ████████████████████ and forwarded

13 ██████ a Confidential Offering Memorandum.

14      31.    This COM that Maita sent to ████████ included Appendix A, Maita's gross

15 profit figures by supplier.

16      32.    Having not heard back from Maita regarding its offer, on October 17, 2008,

17 DBI initiated arbitration with JAMS 39 days after Maita received its Notice of

18 Termination.

19      33.    Maita made no attempt to initiate arbitration against DBI and refused to

20 arbitrate.

21      34.    In the early morning of October 21, 2008, DBI called Maita's President to

22 check the status of its offer, and Maita first told DBI that it had not received the October

23 15, 2008 offer.

24      35.    Marcus Maita wrote an e-mail to his broker at 8:19 a.m. on October 21, 2008

25 to inform him of the details of DBI's call regarding its offer.

26      36.    After hearing that Maita had not received its offer, at 8:32 a.m. on the

27 morning of October 21, 2008, DBI re-conveyed its October 15, 2008 offer.

28

-5-

REVISED [PROPOSED] FINDINGS OF FACT AND
CONCLUSIONS OF LAW

37.   On October 22, 2008, Maita's broker e-mailed ███████ and encouraged it

to submit a bid for Maita's entire business, including its Miller Coors distribution rights,

noting that, at the very least, ███████ bid could ████████████████████████

████████████████████

38.   On October 22, 2008, ███████ made an e-mail offer ███████████████

████████████████████████

39.   On October 23, 2008, rather than counter, Maita's broker asserted that DBI

was not complying with the "spirit of the terms of California law" and demanded that DBI

break down its offer according to all the brands that Maita distributed.

40.   DBI broke down its offer the same day Miller and Coors brand products,

offering ████████████████████████████████████████████

████████████████████████

41.   On October 24, 2008, Maita responded with a counter-offer to ████████████

████████████████████████████

42.   On October 27, 2008, Maita demanded that DBI break-down its previous

offer by all of the brands it distributed, not just its MillerCoors brands.

43.   When Maita made its October 27, 2008 demand, Maita had been engaged in

negotiations regarding the sale of its business or portions thereof with ████████████████

████████████████████████

44.   Maita actively negotiated the potential purchase of its business with

████████ including submitting a counter-offer to ███████████████████████ two

days after ███████ made its first offer to purchase portions of Maita's business for

████████

45.   DBI refused to encourage a bidding war, declined to break down an offer for

brands other than the MillerCoors brands, and reiterated its offer to buy MillerCoors for

████████ and the entire business for ████████

46.   On October 29, 2008, ███████ made what it deemed its "final offer" for

████████████████████████████████████████████

-6-

REVISED [PROPOSED] FINDINGS OF FACT AND
CONCLUSIONS OF LAW

1    47.   On October 31, 2008, Maita claimed that DBI's unwillingness to break down

2    prices in dollar terms for each (non-MillerCoors) brand in Maita's portfolio constituted bad

3    faith and that DBI's ███████████ offer for MillerCoors was a "low-ball price."

4    48.   DBI reiterated its offer to Maita on November 3, 2008, and it requested

5    Maita provide it with a counteroffer.

6    49.   Maita never provided DBI with a counteroffer in response to DBI's

7    November 3, 2008 request.

8    50.   The parties continued to negotiate into December 2008, and exchanged

9    documents reflecting what savings might follow a combined operation, but could not agree

10   on what those savings would be.

11   51.   On December 15, 2008, DBI increased its purchase price and offered Maita

12   ███████████ for all of its distribution rights.

13   52.   Maita rejected all of DBI's purchase offers.

14   53.   No agreement for sale of Maita's business to DBI was ever reached.

15   54.   Maita never provided DBI with any counter-offer for its MillerCoors

16   distribution rights or for any other portion of its business.

17   55.   Maita never conveyed to DBI an asking price for its MillerCoors distribution

18   rights or for any other portion of its business.

19   56.   Maita's President contends that Maita negotiated in good faith with DBI

20   throughout these negotiations.

21   57.   When asked to describe all facts showing that Maita negotiated in good faith,

22   Maita responded only that it "provided sufficient information to DBI to allow DBI to make

23   a good faith offer to purchase Plaintiff's MillerCoors rights."

## II. CONCLUSIONS OF LAW

25   1.   Pursuant to section 25000.2(d), DBI, as the successor beer manufacturer's

26   designee, and Maita, as the existing beer wholesaler, were both required to negotiate in

27   good faith.

28   2.   DBI negotiated in good faith for Maita's Miller and Coors distribution rights,

-7-

1  the requirements of section 25000.2 have been met, and Maita must arbitrate.

2       3.     Good faith negotiation is not a condition precedent to arbitration under

3  section 25000.2, and Maita must arbitrate.

4       4.     Because Maita failed to negotiate in good faith, it has waived the right to

5  participate in the arbitration.

6  DATED:  November 13, 2009    SHEPPARD, MULLIN, RICHTER & HAMPTON LLP

7

8                 By      _____
                                    */s/ Mark K. Slater*

9                                     MARK K. SLATER
                                    Attorneys for Defendant

10                                    DBI BEVERAGE INC.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

-8-

REVISED [PROPOSED] FINDINGS OF FACT AND
CONCLUSIONS OF LAW