United States District Court
For the Northern District of California

**E-FILED on** __11/30/09__

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| MAITA DISTRIBUTORS, INC. OF SAN MATEO, a California corporation,<br><br>Plaintiff,<br><br>v.<br><br>DBI BEVERAGE INC., a Tennessee corporation,<br><br>Defendant. | No. C-09-02318 RMW<br><br>FINDINGS OF FACT AND CONCLUSIONS OF LAW |

This action was brought by Maita Distributors, Inc. of San Mateo ("Maita") against DBI Beverage Inc. ("DBI") seeking declaratory relief on a number of issues relating to the applicability and constitutionality of California Business & Professions Code Section 25000.2.[1] On November 3, 2009, the court issued its order granting in part and denying in part the parties' cross-motions for summary judgment (Docket # 115), leaving only one issue for trial: whether pursuant to Section 25000.2, DBI negotiated with Maita in good faith to determine the fair market value of Maita's MillerCoors distribution rights. Maita contends that such good faith negotiation is a precondition to the statutory arbitration procedure set forth in Section 25000.2 and that a failure by DBI to negotiate in good faith means that Maita cannot be compelled to arbitrate the dispute. This issue was tried to

---

[1] The Complaint also initially asserted a claim for breach of contract against DBI, but that claim was dismissed without prejudice upon the stipulation of the parties. Docket # 47.

FINDINGS OF FACT AND CONCLUSIONS OF LAW—No. C-09-02318 RMW
TER

the court on November 17, 2009.  Following the close of plaintiff's evidence, defendant moved for judgment pursuant to Rule 52(c).  Defendant's motion is granted.  The court's findings of fact and conclusions of law are set forth below.

## I. FINDINGS OF FACT

1. Maita Distributors Inc. has been a distributor of Miller Beer Company products since 1971 and entered into its current Miller distribution agreement in 1999.  Maita Testimony.

2. Maita has been a distributor of Coors Brewing Company products since 2002 when it entered into a distribution agreement with Coors.  Maita Testimony.

3. Maita presently has the exclusive right to distribute Miller and Coors products in San Mateo County, California.  It also has distribution rights for certain other brands.

4. In 2008, Miller and Coors formed a joint venture, MillerCoors LLC, and each assigned to MillerCoors its respective brands.  MillerCoors also assumed the Miller and Coors distribution contracts, including the contracts with Maita.

5. In August 2008, MillerCoors informed Maita that MillerCoors intended to terminate their distribution agreements and that DBI would be the successor MillerCoors distributor in San Mateo County.  Maita Testimony.

6. Maita began considering its options, including litigating with MillerCoors, selling its entire business to DBI, selling only the MillerCoors distribution rights to DBI and the remaining brand distribution rights to another distributor, or selling only the MillerCoors rights to DBI and attempting to remain in business by distributing only the non-MillerCoors brands.  Maita understood and believed that selling only the MillerCoors rights while retaining the remaining distribution rights was not a viable option and that Maita would be unable to operate the business profitably based only on the distribution of non-MillerCoors product.  Maita Testimony.

7. DBI retained Independent Beverage Group ("IBG") to negotiate on its behalf for Maita's distribution rights.  By late August 2008, Maita had been contacted by IBG's Joe Thompson and Todd Arnold with regard to commencing discussions relating to the sale of all or part of Maita's business to DBI.  Maita Testimony; Thompson Testimony; Ex. 113.  The meeting was cordial, and the context of the meeting suggested that both parties were contemplating the sale of Maita's entire

business and not merely a sale of the MillerCoors distribution rights.  Maita Testimony; Thompson Testimony.

8. DBI understood that it was in everyone's best interest for DBI to buy the entire business, rather than just the MillerCoors rights, but it was willing to buy only the MillerCoors rights.  Thompson Testimony.  DBI sought information from Maita regarding Maita's business as a whole, including such things as sales volumes, expenses, equipment and account information.  Ex 113.

9. On September 3, 2008, Maita retained Ippolito Christon & Co. to represent Maita in negotiating for the sale of Maita's distribution rights.  Ex. 115.

10. On September 8, 2008, Maita received the formal notice from MillerCoors, dated September 2, 2008, of MillerCoors' intent to terminate the distribution agreements and seeking to invoke California Business & Professions Code Section 25000.2.  The letter designated DBI as the successor distributor.  Ex. 2.

11. On September 28, 2008, Maita's representative sent a Confidential Offering Memorandum to DBI's representative soliciting an offer to purchase Maita's distribution rights, and specifically soliciting an offer that separately allocated the proposed purchase price to the MillerCoors rights, the Crown rights, and all other distribution rights.  Ex. 118.

12. DBI did not make a formal offer to purchase Maita's MillerCoors rights by October 8, 2008, the thirtieth day after Maita received notice of MillerCoors' intent to cancel the distribution agreements.  Thompson Testimony; Maita Testimony.  DBI was seeking information from Maita, however.

13. On October 15, 2008, DBI's representative sent an offer to purchase all of Maita's distribution rights to Maita's representative by e-mail.  Ex. 129.  The offer, however, was not received by the intended recipient.  Maita Testimony; Thompson Testimony.

14. On October 17, 2008, DBI initiated arbitration with JAMS, seeking to comply with Section 25000.2 which requires arbitration to be commenced no later than 40 days after the existing distributor received the successor beer manufacturer's notice of intent to cancel.

15. Shortly thereafter, on October 21, 2008 DBI contacted Maita to follow up on the offer, and when DBI discovered that the offer had not been received, DBI promptly re-sent the offer to Maita. Thompson Testimony; Ex. 132. DBI's offer contemplated a purchase of all of Maita's distribution rights based on a multiple of Maita's projected cash operating profit plus adjustments for "synergies", i.e., cost savings that DBI may benefit from by acquiring the San Mateo distribution rights.

16. In response, Maita's representative asked DBI to re-submit the offer "broken down by dollar amount per brand group...." Exh. 134.

17. DBI initially resisted doing so, and Maita suggested that DBI was "unwilling to make an offer for the MillerCoors distribution rights separate and apart from the rest of Maita's portfolio" which Maita suggested was not in compliance with the spirit or terms of California law. Ex. 134. DBI promptly responded with a brand-only offer for the MillerCoors distribution rights, offering to pay a multiple of the trailing twelve-month gross profit for each brand. Ex 134. In response, Maita demanded an offer set forth in dollar-value form, which DBI initially declined to extend. Ex. 134.

18. On October 31, 2008, Maita's representative sent a further letter to DBI's representative, accusing DBI of having failed to negotiate in good faith and demanding an offer expressed in dollar-value format. Ex 135. This is the only contemporaneous evidence that hints that either party viewed the other as behaving in bad faith during the negotiations.

19. DBI responded by e-mail on November 3, 2008 and extended an offer stating an express dollar value for acquisition of the MillerCoors distribution rights as well as a total dollar value for acquisition of the entire Maita portfolio, including the MillerCoors rights. Ex 136.

20. During November 2008, principals for Maita and DBI engaged in some direct discussions, during which Maita conveyed to DBI the approximate dollar value Maita was seeking for the sale of all of the distribution rights. Maita Testimony.

21. Further discussions ensued, and in December, DBI extended an additional offer to purchase all of the portfolio. The offered price was below the price that Maita had conveyed it had in mind. Maita Testimony; Ex 142. Maita declined the offer, believing it to be too low, and terminated negotiations. Maita Testimony; Ex. 142.

FINDINGS OF FACT AND CONCLUSIONS OF LAW—No. C-09-02318 RMW
TER                                                          4

22. Maita did not extend any counteroffers to the various offers received from DBI. Thompson Testimony; Maita Testimony.

23. During the negotiations, both parties had in mind a sale of the entire portfolio of distribution rights. Maita was not interested in selling only the MillerCoors rights and retaining the other brands and it knew that doing so would not enable it to continue as a viable business. DBI was interested in purchasing the entire business and was reluctant to in effect bid against itself for the non-MillerCoors rights by separately extending a dollar-value offer for those rights.

24. While Maita was negotiating with DBI and soliciting separately broken out offers for the MillerCoors rights and for the other brands, Maita was also negotiating with another distributor for the sale of the non-MillerCoors rights. Maita Testimony; Exs. 143-147. Maita had the right to negotiate with others for the sale of its non-MillerCoors distribution rights. Maita's efforts to obtain separately broken out offers from DBI to purchase the MillerCoors rights, the Crown rights, and the other rights, were part of a negotiation strategy by Maita to maximize the likely ultimate sales value of the rights.

25. DBI was reluctant to extend a separately broken out offer for the various brands because it did not want its offer to be used by Maita for leverage in negotiating with other distributors.

26. During the negotiations between Maita and DBI, Maita did not ask for a stand-alone offer for the purchase of only the MillerCoors distribution rights. Rather, Maita sought an offer that separately priced out the MillerCoors rights, as well as the rights to the other brands in the portfolio. The negotiations did not focus on a sale of only the MillerCoors distribution rights, rather the context of the negotiations continued to focus on a sale of the entire business. The primary area of disagreement between the parties was the value of the "synergies" or cost-savings that would accrue to DBI if it acquired Maita's business. Thompson Testimony; Maita Testimony.

27. Maita did not offer any evidence that DBI's offers were significantly below the fair market value for Maita's distribution rights. In particular, Maita did not offer any evidence that the offers were so low as to be outside the reasonable expectation of parties who were engaged in arms-length business negotiations.

28. DBI negotiated in good faith with Maita for the purchase of Maita's business, including the purchase of the MillerCoors distribution rights.

## II. CONCLUSIONS OF LAW

1. California Business & Professions Code Section 25000.2 provides an expedited method to determine the fair market value of the beer distribution rights to be paid to an existing beer wholesaler (distributor) whenever a successor beer manufacturer acquires rights to manufacture, import or distribute a product and cancels any of the existing beer wholesaler's distribution rights. Maita is an "existing beer wholesaler," MillerCoors is a "successor beer manufacturer," and DBI is the "successor beer manufacturer's designee" as those terms are used in the Act.

2. The statutory procedures are triggered when a successor beer manufacturer notifies the existing beer wholesaler of the successor beer manufacturer's intent to cancel any of the existing beer wholesaler's rights to distribute the successor beer manufacturer's product. Section 25000.2(c). MillerCoors gave such notice on September 2, 2008.

3. Section 25000.2(d) requires the successor beer manufacturer's designee and the existing beer wholesaler to negotiate in good faith to determine the fair market value of the affected distribution rights.

4. Under Section 25000.2(f), if the successor beer manufacturer's designee and the existing beer wholesaler are unable to mutually agree on the fair market value of the affected distribution rights within 30 days after the existing beer wholesaler's receipt of the successor beer manufacturer's notice of intent to cancel, then the successor beer manufacturer's designee or the existing beer wholesaler shall initiate arbitration against the other to determine the issue of compensation for the fair market value of the affected distribution rights no later than 40 days after the existing beer wholesaler's receipt of the notice of intent to cancel.

5. Maita and DBI negotiated in good faith. The negotiations were focused on the sale of Maita's entire distribution business as the parties recognized that a sale of all of Maita's distribution rights was Maita's only viable alternative. Maita did not believe it could sell the MillerCoors

FINDINGS OF FACT AND CONCLUSIONS OF LAW—No. C-09-02318 RMW
TER                                                                 6

distributorship rights and continue a profitable business with its remaining distributorship rights. Any sale price successfully negotiated would, of course, encompass the fair market value of the affected MillerCoors distribution rights.

6.  DBI and Maita were unable to mutually agree on the fair market value of the affected distribution rights by the date upon which arbitration was required to be commenced.

7.  DBI's arbitration demand was timely under the statute.

8.  Neither DBI nor Maita waived arbitration by its conduct in negotiating with the other party regarding Maita's distribution rights.

9.  The fact that DBI did not extend an offer to purchase Maita's MillerCoors distribution rights within thirty days after Maita received MillerCoors' notice of its intent to cancel does not mean that DBI negotiated in bad faith for such rights, nor does it provide any basis for determining that the statutory arbitration cannot go forward. During that thirty-day period and in fact at all times thereafter DBI believed based upon Thompson's discussion with Maita that Maita considered selling all of its distribution rights as its only viable alternative. During the thirty-day period, neither DBI nor Maita made a demand that set forth its opinion as to the fair market value of the MillerCoors distribution rights or of the value of Maita's entire distribution business. DBI was in the process of trying to gather information from Maita. On September 28, 2008 Maita did solicit from DBI an offer that would separately allocate specific dollar amounts to the MillerCoors rights, the Crown rights, and all other distribution rights. DBI initially declined to do so as it did not want its valuations of each of Maita's other distribution rights to be used as leverage by Maita in negotiations with other possible buyers of Maita's non-MillerCoors rights. However, following Maita's accusation that DBI was not complying with California law, DBI immediately forwarded a separate valuation of the MillerCoors rights claiming that it had always fully intended to comply with California law. Maita's accusation of DBI's non-compliance with California law and DBI's response claiming it always intended to fully comply with California appear to be self-serving statements made for strategic purposes and are of little evidentiary value in determining whether the parties were acting in good faith. The bottom line is that DBI negotiated in good faith during the thirty-day period and thereafter until Maita terminated discussions in December 2008. An offer did not have to

be made by DBI for it to have been acting in good faith.  In contrast to DBI which did make an offer shortly after the thirty-day notice period, Maita never set forth a written proposal as to what it believed was the fair market value of all of its distribution rights nor of the fair market value of its MillerCoors distribution rights before it terminated negotiations with DBI in December 2008.

DATED:     11/30/09

*Ronald M Whyte*
RONALD M. WHYTE
United States District Judge

**Notice of this document has been electronically sent to:**

**Counsel for Plaintiff:**

| | |
|---|---|
| Craig S. Ritchey | eFilingPA@dorsey.com |
| John G. Hursh | eFilingPA@dorsey.com |
| Karen Elizabeth Wentzel | eFilingPA@dorsey.com |
| Patricia Anne Welch | eFilingPA@dorsey.com |

**Counsel for Defendant:**

| | |
|---|---|
| Elise Kathryn Sara | esara@sheppardmullin.com |
| Jonathan P. Hersey | jhersey@sheppardmullin.com |
| Mark Kenneth Slater | mslater@sheppardmullin.com |

**Counsel for Intervenor:**

| | |
|---|---|
| Jesse Frank Ruiz | jfr@robinsonwood.com |
| Alissa Brett Rubin | arubin@kslaw.com |
| Michael W. Youtt | myoutt@kslaw.com |
| Russell D. Workman | rworkman@kslaw.com |

Counsel are responsible for distributing copies of this document to co-counsel that have not registered for e-filing under the court's CM/ECF program.

**Dated:**   11/30/09                                             TER
                                                        **Chambers of Judge Whyte**

FINDINGS OF FACT AND CONCLUSIONS OF LAW—No. C-09-02318 RMW
TER                                                                 9